UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br><br> v. <br><br> 301 ADAMS STREET, QUINCY, MASSACHUSETTS; 1548-1558 DORCHESTER AVENUE, DORCHESTER, MASSACHUSETTS; and FIVE (5) CERTAIN PARCELS OF LAND WITH THE BUILDINGS(S) THEREON IN BROCKTON PLYMOUTH COUNTY, MASSACHUSETTS, COMMONLY KNOWN AS 11 ROSSETER STREET, 16 ROSSETER STREET, 213-223 NORTH MAIN STREET, 204 NORTH MONTELLO STREET, AND 227 NORTH MAIN STREET, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THEREON, <br> Defendants. | **FILED EX PARTE AND UNDER SEAL** <br><br> Civil Action No. <br><br> 04 - 12582 RCL <br><br> MAGISTRATE JUDGE Dein |

RECEIPT #
AMOUNT $ N/A
SUMMONS ISSUED N/A
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. FDM
DATE 12|10|04

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, in a civil action of forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 18, United States Code, Section 981(a)(1)(A), alleges that:

1.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345, 1355, and 1356.  Venue is appropriate pursuant to 28 U.S.C. § 1395.

2.    The in rem Defendant Properties are now, and, during the pendency of this action, will be within the jurisdiction of this Court.

3.    The Defendant Properties are described as:

a.  the real property and buildings located at 301 Adams
    Street, Quincy, Massachusetts, having a deed recorded
    at the Norfolk County Land Court as Document No.
    1025853, noted on Certificate of Title No. 167544 ("301
    Adams"), currently owned by Tina Le;

b.  the real property and buildings located at 1548-1558
    Dorchester Avenue, Dorchester, Massachusetts, having a
    deed recorded at the Suffolk County Registry of Deeds
    at Book 32823, Page 262, ("1548 Dorchester"), currently
    owned by Tina Le; and

c.  five (5) certain parcels of land with the buildings(s)
    thereon in Brockton, Plymouth County, Massachusetts,
    commonly known as 11 Rosseter Street, 16 Rosseter
    Street, 213-223 North Main Street, 204 North Montello
    Street, and 227 North Main Street, having a deed
    recorded at the Plymouth County Registry of Deeds, Book
    29342, Page 298, ("204 North Montello"), currently
    owned by DL Group, L.L.C.,

(collectively referred to as the "Defendant Properties").

4.  As detailed in the Affidavit of Federal Bureau of
Investigation Special Agent Brad Carpenter, which is attached as
Exhibit A and incorporated herein by reference, the United States
has probable cause to believe that the Defendant Properties
constitute or are derived from proceeds of mail fraud and/or wire
fraud, in violation of 18 U.S.C. §§ 1341 and/or 1343, and
therefore are subject to forfeiture pursuant to 18 U.S.C.
§ 981(a)(1)(C).  In addition, the United States has probable
cause to believe that the Defendant Properties were involved in
transactions or attempted transactions in violation of 18 U.S.C.
§§ 1956 and/or 1957, and therefore are subject to forfeiture
pursuant to 18 U.S.C. § 981(a)(1)(A).

5.  By virtue of the facts set forth above and in the

2

attached Affidavit, the Defendant Properties are, therefore, subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C), and 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays:

(1) that judgment of forfeiture be decreed against the Defendant Properties;

(2) that, thereafter, the Defendant Properties be disposed of according to law; and

(3) for costs and all other relief to which the United States may be entitled.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    _____
       KRISTINA E. BARCLAY
       Assistant U.S. Attorney
       1 Courthouse Way, Suite 9200
       Boston, MA   02210
       (617) 748-3371

Date:  12/9/04

3

<u>Verification</u>

I, Brad Carpenter, Special Agent, Federal Bureau of Investigation, state that I have read the foregoing Complaint for Forfeiture <u>In</u> <u>Rem</u> and the attached Affidavit, and the contents thereof are true to the best of my knowledge, information, and belief.

_____
Brad Carpenter
Special Agent
Federal Bureau of Investigation


COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss                                                      Boston

Then personally appeared before me the above-named Brad Carpenter, Special Agent, Federal Bureau of Investigation, who acknowledged the foregoing to be true to the best of his knowledge, information, and belief, on behalf of the United States of America.

Sworn and subscribed to before me this _9_ day of December, 2004.

_____
Notary Public


My commission expires:

_May 15, 2009_____

KAY-BETH WHITTEN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 15, 2009

4

## EXHIBIT A

### AFFIDAVIT OF BRAD CARPENTER

I, Brad Carpenter, being duly sworn, hereby depose and state as follows:

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since April 2003. I am currently assigned to the FBI's Boston Field Division. Since August 2003, I have been assigned to the Health Care Fraud Squad.  In this capacity, my duties and responsibilities include conducting criminal investigations of individuals and business who have violated federal criminal laws, with an emphasis on health care-related conduct.

2.    I graduated from the FBI Training Academy in Quantico, Virginia in April 2003, where I received training in the area of financial investigations.  The topics included wire and mail fraud, money laundering, bank fraud and conspiracy.  I also received instruction on probable cause as it relates to search and seizure warrants, and methods and practices of executing them.  During my tenure, I have participated in a variety of investigations, in which I have participated witness interviews, arrests and searches.  My previous professional experience included working for three years in the area of computer software.

3.    I submit this Affidavit in support of a complaint for civil forfeiture against:

      a.    the real property and buildings located at 301 Adams Street, Quincy, Massachusetts, having a deed recorded at the Norfolk County Land Court, as Document No. 1025853, noted on Certificate of Title No. 167544 ("301 Adams"), currently owned by Tina Le;

      b.    the real property and buildings located at 1548-1558 Dorchester Avenue, Dorchester, Massachusetts, having a deed recorded at the Suffolk County Registry of Deeds at Book 32823, Page 262, ("1548 Dorchester"), currently owned by Tina Le; and

      c.    five (5) certain parcels of land with the buildings(s) thereon in Brockton, Plymouth County, Massachusetts, commonly known as 11 Rosseter Street, 16 Rosseter Street, 213-223 North Main Street, 204 North Montello Street, and 227 North Main Street, having a deed recorded at the Plymouth County Registry of Deeds at Book 29342, Page 298 ("204 North Montello"), currently owned by DL Group, L.L.C.,

(the "Defendant Properties").

2

4.    I have probable cause to believe that the Defendant
Properties constitute or are derived from proceeds traceable to
mail fraud and/or wire fraud in violation of 18 U.S.C. §§ 1341
and/or 1343, and therefore are subject to forfeiture pursuant to
18 U.S.C. § 981(a)(1)(C).  I further have probable cause to
believe that the Defendant Properties constitute property
involved in transactions or attempted transactions in violation
of 18 U.S.C. §§ 1956 and/or 1957, or are traceable to such
property, and therefore are subject to forfeiture pursuant to 18
U.S.C. § 981(a)(1)(A).

5.    The information contained in this affidavit was either
observed by me or related to me by other law enforcement officers
involved in this investigation.  The participants involved in the
joint investigation described below include Special Agent Michael
McCall of the FBI, Investigator Scott Faragi of the Insurance
Fraud Bureau of Massachusetts ("IFB"), Special Agents Marion T.
Benevento and William Skene of the Internal Revenue Service,
Criminal Investigation Division ("IRS"), IRS Revenue Agent David
LaJoie, and Inspector John Hickey of the United States Postal
Inspection Service ("USPIS").  This affidavit is based upon
statements that I obtained or which were communicated to me by
witnesses or others participating in the investigation,
surveillance conducted by myself and others participating in the
investigation, and my review of documents and business records.

3

I am familiar with the circumstances of the offenses described in this affidavit.  This affidavit is submitted for the limited purpose of establishing probable cause for forfeiture of the Defendant Properties.  In light of the limited purpose for which this affidavit is being submitted, I have not included each and every fact known to me concerning this investigation.

## OVERVIEW OF THE SCHEME

6.     Since 1994, Tien "Tina" Le, along with her daughters

Mercedes Tang and Misa Tang, and common-law husband, Steven

Nguyen, and others (collectively the "Tina Le Organization" or

the "Subjects") have owned and operated, either directly or

indirectly, the following corporations:

        a.    First State Labor Services, Inc.;

        b.    T. Nguyen Temporary;

        c.    Wonder Fast Labor Services, Inc.;

        d.    Bay State Temp. Agency, Inc.;

        e.    Mass Labor Services Corp.;

        f.    Labor Staffing, Inc.; and

        g.    Star Labor Staffing, Inc.

7.     Through these entities, the Tina Le Organization has

operated temporary employment agencies which specialize in

providing workers, including many recent immigrants, to various

businesses, particularly manufacturers and distributors of

consumer goods (the "Client Companies"), in Massachusetts and

elsewhere.  They have defrauded various insurance companies and

the IRS by substantially under-representing the number of workers

they employ, thereby illegally reducing their employment taxes

and workers' compensation insurance premiums.

5

## BACKGROUND

8.   What follows is a brief explanation of: a) how temporary employment agencies operate; b) how the workers' compensation system in Massachusetts works; c) the obligations of employers to report their payroll to the IRS; and d) the way in which fraudulent temporary employment agencies evade their reporting obligations to their insurers and the IRS.  These explanations are based on information provided to me by IRS Special Agent Skene, as well as IFB Investigator Faragi, whose agency is charged with rooting out fraud in the Massachusetts workers' compensation insurance system.  The information below also is based on interviews of insurance company auditors conducted either by me or others involved in the investigation.

9.   Investigator Faragi has conducted fraud investigations for over nine years.  From 1995 to 1998, Investigator Faragi was a financial investigator in the Massachusetts Attorney General's Office.  Since 1998, he has been an IFB Investigator and has devoted nearly all of his time to investigating insurance premium fraud, in conjunction with state and federal prosecutors.  Based on this experience, he is familiar with how the workers' compensation system works, and the common methods by which employers, including temporary employment agencies, attempt to

evade their reporting obligations.[1]

**Temporary Employment Agencies Defined**

10.    The term "temporary employment agency" refers to a business arrangement whereby the "agency" provides client companies with workers, ordinarily on a short-term basis.  Under such arrangements, the client companies direct the day-to-day work of the employees, while the agency maintains administrative responsibility over them.  Specifically, the agency is ordinarily responsible for issuing paychecks to the employees and for processing payroll deductions for taxes, social security obligations, health care benefits and/or union dues.  The agency is also responsible for meeting certain other fiduciary responsibilities of employers, including maintaining workers' compensation insurance for each employee.

---

[1] To assist the investigative team at the search sites, I request that the Court allow Investigator Faragi, and Kenneth Craig his direct supervisor, Deputy Chief Anthony DiPaolo, and another IFB Investigator, Kenneth Craig, to participate in the searches under my and S.A. McCall's supervision so they might provide advise in identifying relevant evidence peculiar to the workers compensation insurance cases.  Such assistance is governed by 18 U.S.C. § 3105, which provides that civilians may aid in the execution of a search warrant only in the presence of an authorized law enforcement officer.  To ensure their safety, the IFB Investigators would not participate in the initial entry of the premises.

**The Workers' Compensation System in Massachusetts**

11.   Massachusetts law requires that employers obtain workers' compensation insurance coverage so those employees who suffer work-related injuries will be compensated in accordance with the workers' compensation laws of Massachusetts.  As with other forms of insurance, employers obtain workers' compensation insurance by paying fees, known as premiums, to insurance companies which issue insurance policies that cover the employers' obligations to pay for on-the-job injuries.

12.   Workers' compensation insurance typically is obtained for a fixed period, often one year, known as the insurance "policy term."  At the beginning of a policy term, an employer is required to provide its workers' compensation insurer with estimates of its anticipated payroll and number of client companies during the upcoming policy term, as well as information regarding the job classifications of its employees.  The insurer uses the employer's payroll estimates to determine an estimated premium, which the employer may be required to pay, in part or in full, before or during the policy term.

13.   After the close of a policy term, the insurance company normally conducts an "audit" of the employer's actual payroll during the policy term.  The purpose of an audit is to verify the accuracy of the agency's payroll estimates and, if necessary, to adjust the amount of installment payments the agency may be

8

obligated to pay. Such audits may be informal, such as obtaining information through a telephone call, or they may involve a more comprehensive review of records.

14. During such audits, the agency is required under the standard insurance contract to report to the insurance company its actual payroll during the policy term, as well as the number of client companies and employees. The agency may also be required to furnish records, such as employment tax withholding documents, to verify the payroll figures provided.

15. Actual payroll figures are used to determine the final amount of the agency's premium for the policy term. If the agency's actual payroll exceeds the amount of payroll estimated at the beginning of the policy term, the agency would pay the difference in the premiums. Conversely, if the estimated figures exceed the actual amount, the agency may be entitled to a refund.

**Federal Employment (Payroll) Tax**

16. The Federal employment tax rate is 15.3% of an employee's wages. The employee is liable for one-half of this 15.3%, or 7.65% of the employee's wages, and the employer is liable for he other half, or 7.65% of the employee's wages. Federal tax laws require an employer to withhold the employment taxes for which its employees are liable from its payroll, and to report and pay those withheld taxes to the IRS. Federal tax laws further require an employer to report and to pay its share of

9

employment taxes to the IRS. An employer is required to report payroll taxes by filing an IRS Form 941, Employer's Federal Quarterly Tax Return ("Form 941"). The employer must file a Form 941 for each quarter, ending on March 31st, June 30th, September 30th, and December 31st of every year. Federal employment taxes consist of Social Security Tax and Medicare Tax.

**Common Tactics Used To Avoid Workers'**
**Compensation Insurance and Tax Obligations**

17. Investigator Faragi also informs me that there are various tactics a temporary employment agency might use to evade, at least partially, its employment tax and workers' compensation insurance obligations. The essence of all of these tactics is the under-reporting of payroll. A lower payroll means a lower employment tax levy and a lower workers' compensation insurance premium.

18. According to Investigator Faragi, the most common method used to evade employment taxes and workers' compensation insurance premiums is paying temporary employees in cash ("under the table"), and not reporting the cash payments to the insurance auditor or the IRS. Agencies that engage in this practice typically maintain two sets of records, one reflecting the "above the table" payroll of employees for whom employment tax is withheld, and the other set, which is invariably much larger, reflecting the "under the table," cash payroll. The agency will only show to the insurance auditor and report to the IRS the

10

first set of records.

19.    Agencies that pay employees "under the table" typically take further steps to conceal their schemes.  Because auditors often ask to review bank statements, fraudulent temporary employment agencies often refrain from depositing client company payments directly into their bank accounts.  Rather, they cash the checks and distribute the proceeds among their employees, and then deposit the remainder into one or more bank accounts.  Accordingly, bank statements and other records provided to the auditor may not raise suspicion.

20.    The principals of such agencies also take affirmative steps to insulate themselves from any liability.  They often submit to the audit through an intermediary, usually an accountant.  The principals also will list individuals who have little or no managerial authority as officers of the corporation.  They use these "straws" to conceal the identities of the people who really are running the business.  Investigator Faragi further explained to me that, in the ordinary course of business, companies like these routinely use the mails for a variety of business practices, including mailing premium adjustment notices (documents mailed to workers' compensation insurance customers which reflect adjustments to their insurance premiums based upon the results of the audit) as well as invoices for payment.  When an employer conceals payroll from an insurance auditor or

11

otherwise evades insurance premiums, these mailings reflect the
fraudulently reduced premiums and other false data.  As such,
these mailings are both reasonably foreseeable and necessary
steps in the execution of a fraud scheme.

21.  Investigator Faragi adds that principals of fraudulent
temporary employment agencies also use straws to create a veil of
legitimacy for "under the table" payments to employees.  Payments
to independent contractors are not subject to Federal employment
taxes, but such payments must be reported to the IRS on an Form
1099 ("Form 1099").  It is not uncommon for an agency intending
to defraud the IRS by filing a Form 1099, naming a "straw" as an
independent contractor and characterizing their "under the table"
cash payments to employees as payments to the independent
contractor.  Because the filing of several Forms 1099 lends the
appearance that the recipients of the payments are actually
employees, agencies will attribute all of the cash payments to a
small number of independent contractors.  When questioned,
principals of these agencies will often falsely contend that the
"straws" named on their 1099 Forms are subcontractors who supply
additional temporary workers to the agency.

22.  If they sense that insurance auditors are becoming
skeptical, temporary employment agencies that knowingly under-
report their payroll typically change the names of their
companies.  They might dissolve or abandon a corporation, or

12

reincorporate it under a different name, while maintaining the same employees and servicing the same client companies. Changing the corporate name, as well as the nominal corporate officers, enables an agency to apply anew for workers' compensation insurance without the suspicious track record of the old company, thereby avoiding a denial of coverage or an increase in premium. The use of an audit contact, often an accountant, conceals from the auditor the identities of the people really running the successor business.

## THE INVESTIGATION

23.    In January 2000, IFB Investigator Faragi contacted the FBI regarding an ongoing state investigation into a temporary employment agency operated by Tien "Tina" Le.  The ensuing federal investigation, which included physical surveillance, document review, witness interviews, trash interceptions, consensual recordings and undercover operations, revealed that the temporary employment organization run by the Tina Le Organization was indeed paying its employees in cash, "under-the-table," to avoid employment and income taxes and reduce their workers' compensation insurance premiums, thereby defrauding the IRS and the workers' compensation insurers.

24.    As part of this investigation, Investigator Faragi contacted the Workers' Compensation Rating and Inspection Bureau of Massachusetts ("the WCRIB") in Boston, Massachusetts.  WCRIB

13

records reflect that each of the following entities operated in Massachusetts as a temporary employment agency, and carried workers' compensation insurance through the WCRIB:

     a.   First State Labor Services, Inc.;

     b.   T. Nguyen Temporary;

     c.   Wonder Fast Labor Services, Inc.;

     d.   Bay State Temp. Agency, Inc.;

     e.   Mass Labor Services Corp.;

     f.   Labor Staffing, Inc.; and

     g.   Star Labor Staffing, Inc.

25. I have reviewed the WCRIB records relating to the above-listed employment agencies, as well as numerous records from over one hundred Client Companies that hired temporary workers from these agencies. The Client Companies largely include manufacturing and distribution operations that require unskilled or semi-skilled workers. Some of these companies retained the services of more than one hundred temporary employees of the Tina Le Organization.

26. The Client Company records we obtained included, among other things, employee lists, time sheets, invoices, cancelled checks and correspondence from the temporary employment agencies. Many of the Client Companies completed questionnaires about their dealings with the temporary agencies, and I and others on the investigative team have conducted numerous interviews of Client

14

Company representatives. I also have reviewed records filed on behalf of these agencies with the Secretary of the Commonwealth of Massachusetts Corporations Division, and numerous financial institution records regarding these agencies. I and others on the investigative team also have interviewed former employees of these agencies.

27. Based on this information, it appears that each of the above-listed corporations have been a front for the Subjects' fraudulent temporary services business. As depicted in the chart attached as **Exhibit 1**, the subjects began operating two temporary employment agencies in 1995, Wonder Fast Labor Services, Inc., owned by Steven Nguyen, and First State Labor Services, Inc., owned by Tina "Tien" Le. Since then, the organizations merged under the name Mass Labor Services Corp. and have since done in business under the various names listed above. I submit this affidavit in support of a search warrant for locations related to these companies.

**Connections Among Companies Fronting For the Tina Le Organization**

28.    Set forth in this section is the evidence establishing
that First State Labor Services, Inc., T. Nguyen Temporary,
Wonder Fast Labor Services, Inc., Bay State Temp. Agency, Inc.,
Mass Labor Services Corp., Labor Staffing, Inc. and Star Labor
Staffing, Inc., were the names under which the subjects operated
a fraudulent temporary services agency.

29.    I have reviewed records on file with the Office of the
Secretary of the Commonwealth of Massachusetts relating to a
number of temporary employment agencies.    I also have conducted
interviews of and reviewed documents provided to me by former
employees of these agencies, insurance auditors, financial
institutions and Client Company representatives.    I also have
reviewed business records, including invoices, correspondence and
time sheets, discovered in intercepted trash for the Subjects'
primary residence at 301 Adams Street, Quincy, Massachusetts
("301 Adams").

30.    This information reveals that the Subjects have owned
and controlled the same temporary employment agency since 1995.
The Subjects have operated the agency under the guise of several
different corporations.    Although the corporations nominally were
run by different officers and directors, the individuals were
merely straws for the Subjects.    They used these straws so that
the insurers would not know who really ran the company.

16

**First State Labor Services, Inc.**

31.    Tien "Tina" Le ("Le") incorporated First State Labor Services, Inc. ("First State") on December 13, 1995 and voluntarily dissolved the company on September 25, 1998.[2]  During First State's existence, Le was President, Treasurer, Clerk and 100% owner of First State.  Client Companies reported to investigators that Le, her daughter Mercedes Tang and/or Steven Nguyen were their business contacts at First State, and that these Subjects represented themselves to Client Companies as partners in an employment agency.

32.    First State applied for workers' compensation insurance and was assigned a policy through Travelers Indemnity Co. ("Travelers") beginning on December 27, 1995.  In February 1998, during a routine workers' compensation insurance audit, Travelers uncovered discrepancies, which caused Travelers to assess First State a $162,243 increase in its insurance premium.  In June 1998, shortly after this assessment, First State claimed to have ceased operation and did not pay the premium.

---

[2]  First State was not Le's first foray into the temporary employment business.  Client Company and bank account information revealed that Le operated a temporary services company under the name "T & L Temporary Services Inc." as early as December 1993, and that it merged with First State in November 1995.  First State inherited its Post Office Box, telephone number and fax number from "T & L Temporary Services Inc."

**T. Nguyen Temporary**

33.   In February 1998, the same month as First State's last
audit, Tien Duc Nguyen, d/b/a T. Nguyen Temporary ("T. Nguyen"),
applied for workers' compensation insurance as a temporary
employment agency.   T. Nguyen was assigned a policy through
Liberty Mutual Fire Insurance Company ("Liberty Mutual")
effective February 1998.   The Liberty Mutual policy was cancelled
on July 14, 1998 after T. Nguyen failed to afford access to its
operations for audit purposes.

34.   Although T. Nguyen told Liberty Mutual that it never
had any Client Companies and had only one employee, letters and
invoices produced by Client Companies reflect that First State
continued to do business under the name of T. Nguyen beginning in
or around June 1998.   For example, on June 2, 1998, Le sent
letters to at least two First State Client Companies announcing
that First State and T. Nguyen would be "merging together
starting on June 8, 1998."[3]   One letter, to Americraft Carton,
Inc. ("Americraft"), is printed on T. Nguyen letterhead, and the
other, to Quebecor Printing ("Quebecor"), is printed on First
State letterhead.   The letters further state that the telephone

---

[3]   Whenever a Tina Le Organization entity changed its name,
it sent letters to Client Companies referring to a "merger" or
"name change."   However, a search of the Secretary of the
Commonwealth records revealed no merger documents relating to any
of the Tina Le Organization entities.   It appears the
Organization was simply changing names.

number and address would remain the same, but that the Client Companies would be provided with T. Nguyen time sheets.

35. Audit records, as well as information and documents provided by Client Companies, and Client Company checks cashed at Broadway Enterprises, 100 Water Street, Worcester, Massachusetts ("Broadway") reflect that First State and T. Nguyen shared virtually the same Client Companies. Information provided by representatives of some of those Client Companies indicated that Mercedes Tang was the primary point of contact for both companies, and that T. Nguyen used the same mailing address - P.O. Box 220804, Boston, Massachusetts 02122 - as First State.

36. The connection between First State and T. Nguyen is evident in the Travelers and Liberty Mutual audit papers. Mercedes Tang was an employee of both First State and T. Nguyen, and she was identified as an audit contact for both companies. T. Nguyen audit papers reflect that Mercedes Tang's telephone number was (617) 822-9111 - the same telephone number printed on the First State letterhead. Further, during a November 1998 cancellation audit of First State, the Travellers auditor noted suspicious payments referencing, among other individual and entities, "T. Nguyen Temp."

37. Bank records also reflect that First State continued to operate through T. Nguyen after First State's alleged demise in June 1998. In August 1998, an Asian American Bank account was

19

opened in the name of First State.  As of November 16, 1998, both Le and Tien Nguyen were co-signers on that account.

38.  On July 14, 1998, Liberty Mutual cancelled the workers' compensation policy for T. Nguyen because the company did not allow Liberty's auditor access to its operations for audit purposes.

**Wonder Fast Labor Services, Inc.**

39.  Not long after Tina Le established First State Labor, Steven Nguyen incorporated Wonder Fast Labor Services, Inc. ("Wonder Fast") in September 1995 and was its president, according to records filed with the Secretary of the Commonwealth.  An employee of Client Company Americraft told investigators that Steven Nguyen represented both Wonder Fast and First State in their dealings with Americraft.

40.  A former Wonder Fast employee told investigators that she worked for Steven Nguyen at Wonder Fast from 1996 to 1999. She stated that Steven Nguyen sold Wonder Fast to Le, who merged Wonder Fast into Mass Labor Services Corp. (see Paragraphs 49-56 below).  Bank records confirm that Le made a $20,000 payment to Wonder Fast on or about January 13, 1998.

**Bay State Temp. Agency, Inc.**

41.   On June 8, 1999, Bay State Temp. Agency, Inc. ("Bay State") was incorporated.  Bay State's only officer, according to Secretary of the Commonwealth records, was Phu Huu Nguyen. Wonder Fast's Client Companies received a letter signed by company president Steven Nguyen dated June 20, 1999, which stated that "our company name will change to Bay State Temp Agency, Inc."

42.   Less than three months later, on September 13, 1999, Bay State's Client Companies received in the mail another letter from Steven Nguyen on the letterhead of "Mass Labor Service," the temporary employment agency, under which, as set forth below, Tina Le was doing business at that time.  The letter stated that "Bay State Temp and Mass Labor Service have signed an agreement to combine companies in a merger of equals that will be effective on 9/27/99.  The name of the new company will be Mass Labor Services Corporation . . . . all future payments made to Baystate [sic] Temp Agency after September 27, 1999 should be payable to Mass Labor Services Corporation."

43.   Documents and information from Client Companies confirm that Wonder Fast underwent a name change to Bay State in June 1999, and that Bay State (formerly known as Wonder Fast) and Mass Labor combined some of their business in September 1999. Although Bay State continued to service some of its Client

21

Companies until at least October 2003, Steven Nguyen stated in a letter to Client Company TAC Group, Inc. that the two entities have "signed an agreement to combine companies in a merger of equals that will be effective on 9/27/99" and that the entities would be operating under the name of Mass Labor.

**Mass Labor Services Corp.**

44.   Mass Labor Services Corp. ("Mass Labor") was incorporated on September 9, 1998 and its last filing with the Secretary of the Commonwealth was an Annual Report filed on March 20, 2001.   According to the Secretary of the Commonwealth records, Mercedes Tang was President and 100% owner of Mass Labor until June 1999.

45.   Letters received in the mail by Client Companies reflect that T. Nguyen changed its name to Mass Labor in or around January 1999.   For example, on January 18, 1999, Le mailed letters on Mass Labor letterhead to at least two Client Companies, Quebecor and Americraft, stating that "[a]s of January 25, 1999, T. Nguyen Temporary will be merging with a new company to form: Mass Labor Services Corporation".   The letters further state that "[a]ll time sheets and other corresponding information will also be transferred to Mass Labor Services Corp.," and both letters reference an attached "new Certificate of Insurance."

46.   Insurance audit papers also reflect that Mass Labor succeeded to the business of T. Nguyen and First State.   Mass

22

Labor applied for workers' compensation insurance and was
assigned a policy through Travelers beginning on November 20,
1998.  The primary audit contact for Mass Labor was Melissa Brown
("Brown"), an accountant with the office of Hung T. Pham-Do, CPA,
MST ("Pham-Do Accounting").  Another accountant with Pham-Do
Accounting had served as a primary audit contact for First State.
The insurance records also reflect that Mercedes Tang was
involved in all three companies, and that Le, the President and
owner of First State, was an "employee" of Mass Labor.  First
State, T. Nguyen and Mass Labor also used the same Post Office
Box - 220804 - in Boston, Massachusetts.

47.  According to Travelers documents, the apparent
connections between First State and Mass Labor prompted Travelers
to conduct an investigation in or around January 1999.  The
investigation revealed that First State and Mass Labor shared the
same telephone number - (617) 822-9111 (which was also the phone
number provided to Liberty Mutual for T. Nguyen) - and fax
number.  In January 1999, the outgoing message on the answering
machine for Mass Labor at telephone number (617) 822-9111 stated
that the caller had reached "First State Labor" and could contact
"Tina Le" at a beeper number in an emergency.  On January 22,
1999, Misa Tang, another of Le's daughters and the Office Manager
for First State, told a Travelers investigator that First State
was in the process of changing the company name and owner.  Misa

23

Tang told the auditor that the Client Companies would remain the same, and that First State had recently sent letters to its Client Companies advising them of the name change. Misa Tang further stated that Mercedes Tang was the new owner and that Le was "just an employee." The Travelers investigator later spoke with Tina Le's other daughter, Mercedes Tang, who at first denied any relation to First State, and then later claimed that she had taken over First State from Le and changed the name when Le could not pay the outstanding premium due Travelers. Mercedes Tang confirmed that Mass Labor had the same Client Companies as First State, that she had not paid Le any money for the business, and that the transaction was entirely verbal. A Travelers investigator also noted signs on the wall of the hallway and the door of Mass Labor's physical location at 1151-1162 Dorchester Avenue in Dorchester, Massachusetts reading "Mass Labor Services & First State Labor Services."

48. Based on its findings, the Travelers investigator concluded that Mass Labor was the successor-in-interest to First State, and recommended that Mass Labor be denied insurance coverage because First State still owed $162,243 in unpaid premiums to Travelers. Travelers filed a civil action against Mass Labor for payment of the First Labor premium, and the parties settled the action. Thereafter, Mass Labor cancelled its Travelers policy and secured workers' compensation insurance

24

through Liberty Mutual.

49.    Audit records, information and documents provided by
Client Companies, and Client Company checks cashed at Broadway
further reflect that First State, T. Nguyen and Mass Labor shared
most of their Client Companies.

50.    Documents and information provided by Client Companies
reflect that Le, Mercedes Tang and Steven Nguyen continued to
manage the Mass Labor operation, even after ownership was
nominally transferred to a Chuong Nguyen in June 1999.  For
starters, a former Mass Labor employee told investigators that Le
owned and controlled the business.  Bank records confirm Le's
role in Mass Labor before and after the "sale" to Choung Nguyen.
On October 28, 1998, Le and Tien Nguyen opened a bank account in
the name of Mass Labor at Asian American Bank, and transferred
money from an Asian American Bank account held in the name of
First State into the new account.  On January 8, 2000, Le opened
a second account at Asian American Bank in the name of Mass
Labor, and described herself as the Vice President of Mass Labor.
Tien Nguyen and Le were both signers on this account, yet Choung
Nguyen was not.

51.    Le's own admissions in loan documents reflect that she
was in charge of the Mass Labor operation.  Specifically, in or
around May 2000, Le stated in a Toyota Financial Services credit
application that she was the President of Mass Labor, and had

25

been for the previous four years.  In addition, in or around June or July 2001, Le stated in an Equity One Uniform Residential Loan Application that she was the "owner" of Mass Labor, and had been for the previous ten years.

52.  Audit records for the policy period February 28, 2000 through February 28, 2001 reflect that Mass Labor represented to its insurance carrier, Liberty Mutual, that business was slow and the last payroll for Mass Labor was on February 16, 2001.  Mass Labor subsequently allowed its Liberty Mutual policy to expire. However, as set forth below, Mass Labor simply changed its name to Labor Staffing, Inc. in or around January 2001.

**Labor Staffing, Inc.**

53.  Labor Staffing, Inc. ("Labor Staffing") was incorporated on January 25, 2001.  According to Secretary of the Commonwealth records, Cu Kim Ngo was the President, Treasurer and Clerk of the corporation.

54.  Letters produced by Client Companies reflect that Labor Staffing succeeded to the business of Mass Labor.  For example, on December 26, 2000, "Chu Nguyen" sent letters on Mass Labor letterhead to at least two Client Companies, Quebecor and John Hancock Financial Services ("John Hancock"), stating that "Labor Staffing will acquire Mass Labor Services on January 3, 2001." The letters further state that the new company name will be "Labor Staffing."

26

55.  Other Client Companies were told that Mass Labor and Labor Staffing merged in March 2001.  For example, on April 2, 2001, the "Management Department" of Labor Staffing mailed a letter to Rome Cable, stating that "[a]ffecting [sic] in [sic] March 15, 2001, Mass Labor Services and Labor Staffing has [sic] merged together."  The letter further states that "Mercedes Luu and Heather Tran will handle any questions".

56.  Based on information provided to me by the cooperating witness whose assistance in this investigation is described below, I believe that Mercedes Luu and Mercedes Tang are the same person.  Specifically, the cooperating witness described a woman who fit the same characteristics as Mercedes Tang, who in the presence of Tina Le and Steven Nguyen, provided the cooperating witness with a business card with the name Mercedes Luu.

57.  In addition, on February 26, 2001, a Labor Staffing "Manager" sent a letter to WareRite Distribution, Inc. stating that "effective March of 2001, Mass Labor Service Corp. will conduct business under a new name" and that the "name change is [sic] LABOR STAFFING, INC."  The writer further states that he "would like to reassure you that the current employees will continue to work with your company as contracted," that "the services will remain the same," and that he "will continue as manager and contact person for Labor Staffing, Inc."

58.  Audit records, information and documents provided by

27

Client Companies, and records of Client Company checks cashed at Broadway reflect that Labor Staffing did business largely with the same Client Companies as First State, T. Nguyen, Mass Labor and Labor Staffing.

59.  Audit and bank account records reflect that, in addition to Client Companies, Mass Labor and Labor Staffing employed many of the same individuals.

60.  Despite Cu Kim Ngo's nominal ownership of Labor Staffing, information and documents provided by Client Companies reflect that Mercedes Tang, Tina Le and Steven Nguyen continued to control the operation.  This information was confirmed by the fact that Le and Mercedes Tang both reported Labor Staffing income to the IRS, and by their own admissions in loan documents. For example, on an April 2001 Nissan Motor Acceptance Loan Application, Le represented that she was the Secretary of Labor Staffing, and on a June 2001 Nissan Motor Acceptance Loan Application, Le represented that she was the Vice President of Labor Staffing.  Similarly, on a November 2002 Indymac Federal Savings Bank Uniform Residential Loan Application, Mercedes Tang represented that she was a manager for Labor Staffing and had been since June 2002.

61.  Bank records also confirm Tina Le's continued leadership role in the organization.  An Asian American Bank checking account in the name of Labor Staffing was opened in

28

October 2000.  Kim Cu Ngo was listed as a signer on the account, but there is also a notation that "Tina Le can handle any issue of this account authorized by Kim Cu Ngo."

62.  In addition, since the date of its incorporation in January 2001, Labor Staffing's principal place of business, according to records filed with the Secretary of the Commonwealth Corporations Division, has been 1548 Dorchester Avenue, Dorchester, Massachusetts ("1548 Dorchester").  Suffolk County Registry of Deeds records reflect that Le and Steven Nguyen purchased 1548 Dorchester on February 28, 2000.

63.  As set forth below, although an Annual Report for Labor Staffing was filed on September 3, 2003, Labor Staffing became "Star Labor Staffing, Inc." in or around May 2003, and Labor Staffing no longer is in operation.

**Star Labor Staffing, Inc.**

64.  Star Labor Staffing, Inc. ("Star Labor") was incorporated on January 22, 2002.  According to the Secretary of the Commonwealth records, Steven Nguyen was the President, Treasurer, Clerk and Director of Star Labor from its date of incorporation to January 2, 2004.  Le Thi Le was the President, Treasurer, Clerk and Director of Star Labor from January 2, 2004 until Steven Nguyen re-assumed those positions on March 4, 2004.

65.  Letters produced by Client Companies reflect that Star Labor was the same business as Labor Staffing.  For example, on

29

April 9, 2003, Steven Nguyen mailed letters on Labor Staffing letterhead to at least two Client Companies, Ames Safety Envelope Co. and Flexcon Industries, stating: "Labor Staffing is happy to announce that on May 1, 2003 we will have a name change to Star Labor Staffing." The letters further state that the company's address will be 1548 Dorchester, and that "the employees and the current rates will remain the same." The letters also instruct the Client Companies to call "Mercedes Luu" with and concerns or questions. Representatives of Client Company John Hancock confirmed that their main contact at Star Labor is Mercedes Tang, and that Star Labor was formerly known as Labor Staffing.

66. Audit records, information and documents provided by Client Companies, and Client Company checks cashed at Broadway reflect that Star Labor shared largely the same Client Companies as Labor Staffing.

67. Audit records and bank records reflect that, in addition to Client Companies, Mass Labor, Labor Staffing and Star Labor reported to their insurers many of the same employees.

68. As with the other entities in the Organization, Le, Mercedes Tang and Steven Nguyen maintain control over Star Labor. Star Labor's principal place of business according to Secretary of the Commonwealth records is 1548 Dorchester. As set forth below, Tina Le, Mercedes Tang and Steven Nguyen admitted their ownership and control of Star Labor in a consensually recorded

30

conversation with a cooperating witness.

**Further Evidence of Fraud**

69.   The evidence gathered during this investigation
revealed that the Tina Le Organization has defrauded various
insurance companies and the IRS by substantially misrepresenting
its income, the number of workers it employs, and the amount of
its payroll, thereby illegally reducing the costs associated with
their workforce, specifically employment taxes, income taxes and
workers' compensation insurance premiums.   What follows is a
summary of that evidence.

**Consensual Recordings of**
**Tina Le, Mercedes Tang and Steven Nguyen**

70.   In or around March 2003, Special Agent Michael McCall
contacted a person known to him as someone who has cooperated
with the government in other investigations ("CW"), to determine
whether CW would be willing to engage Tina Le in a discussion
about her business practices while wearing a concealed recording
device.

71.   CW agreed to cooperate in this and other investigations
as a result of charges CW potentially faces in connection with
CW's own fraudulent temporary services business.   The government
has not promised to forego specific charges or recommend a
particular sentence in exchange for CW's cooperation.   Rather, CW
has been told that the extent of CW's cooperation will be
considered by the government in making its charging and

sentencing decisions.  The information CW has provided in this
and other investigations has proven to be consistently reliable.

72.  In or around March 2003, SA McCall met with CW to
discuss the nature of Le's business, currently named Star Labor
Staffing, Inc., and the questions SA McCall wished CW to ask her.
CW has worked in the temporary services industry and understands
how a temporary services company operates.  SA McCall directed CW
to approach Le posing as a someone who had been in the temporary
services industry who wished to broker a deal between a large
potential consumer of temporary services and a temporary services
agency with the capability of providing hundreds of temporary
workers.  In the term of the proposed business deal, CW would
engage Le in a discussion about, among other things, her business
practices, the size of her organization, her awareness of her
reporting obligations to the WCRIB and the IRS, and how her
finances were kept.  It was anticipated that the discussion of
these topics and the proposed business venture might take place
over the course of several conversations, some over the phone and
others in person.

73.  Between April 25, 2003 and March 2, 2004, CW had six
telephone conversations with Le and one face-to-face meeting with
Tina Le, Mercedes Tang and Steven Nguyen.  Before each
conversation or meeting, SA McCall supplied CW with a recording
device, and showed CW how to operate it.  The face-to-face

meeting with Tina Le took place on June 12, 2003 at the offices of Star Labor at 1548 Dorchester Avenue.  For all but one of the telephone conversations, SA McCall was present with CW during the call.  Upon CW's completion of each telephone call or meeting with the Subjects, SA McCall would collect the tape of the conversation and the recording device.

74.    I have listened to each of the tapes of CW's conversations with the Subjects.  For two of the telephone conversations, the recording equipment was not operational, and recorded only CW's voice.  CW informed me that all of the recorded conversations were in a Vietnamese dialect.  On all but the two mis-recorded tapes, I recognized one of the voices on the tapes as that of CW, and the other as that of a woman.  CW identified the woman whose voice is recorded on all but one of the tapes as Tina Le (there was one recording of a conversation with a woman who is not a subject of this investigation).  On the tapes of the face-to-face meeting, there are two other voices, one male and one female.  CW identified the male as Steven Nguyen and the female as Mercedes Tang.  I forwarded the tapes to a component within the FBI that translates and transcribes foreign language recordings.  CW, who reads, writes and speaks both English and Vietnamese, has reviewed the transcripts and made corrections.  I have reviewed the transcripts and I have discussed them with CW.

33

75. In her conversations with CW, Le stated that she has been in the temporary employment business since 1984. Le also stated that she could supply dozens of workers to a Client Company within hours, and one hundred or more workers to a Client Company on one or two days' notice. Le also stated that she had five hundred people working for her.

76. In her conversations with CW, Le stated that the weekly payroll for her company is between $100,000 and $200,000. She admitted that she pays some of her workers in cash, and some by check. She also admitted that she does not pay insurance premiums on the cash payroll:

> Le: The worker's compensation premiums are based on payroll: "That's how they calculate it . . concerning payroll." "We can save the insurance cost [by not including employees paid cash] on the payroll."[4]

Le also explained to CW that her organization will pay for employee injuries directly, rather than go through the insurance company:

> Le: Yes? Yeah, it's clear cut ... Just like a company- and the one not incorporated,[5] [then] only individual. Here, normally we have worker's comp, we have insurance. We got it all! For example, if it's a big accident, like ...over one thousand [dollars], from one to two thousand or above, then we would let the insurance know, you understand? But below that, it's a

[4] All descriptions of the consensually recorded calls set forth in this Affidavit are based on preliminary transcripts prepared by the FBI.

[5] Words underlined by the translator were spoken in English.

34

> waste of time, because if we do, there's the
> deductible, then they will come to investigate, come to
> the office, asking tons of questions, observing the
> person going to work, time worked...to the point
> [where] they would ask....they investigate the injured
> person simultaneously.  As far as insurance nowadays,
> it's best not to report if not much money is involved.

According to CW, during one of the mis-recorded telephone conversations, Le told CW that, if one of the temporary workers is involved in a work-related accident, and the medical costs will be between $5,000 and $10,000, Le would pay the worker directly rather than go through insurance.  If the cost exceeded $1,000, Le would go through the insurance company.  CW also recalled that Le told CW that, if the injured individual was not on the official payroll, then Le would use her "own accounting" to go back two weeks and recreate the payroll for that person. According to CW, Le would make it look as if the employee was new and was only on the payroll for the last two weeks.  By doing this, Le could show proof to the insurance company that the employee was new and was working there for the past two weeks.

76.  In her conversations with CW, Le also admitted that she did not pay tax on the cash payroll:

> Le:  If I have one hundred [100] workers, I would have
> only around fifty [50] put on the payroll ...
> * * *
> CW: ... at the end of the year ... the people [workers]
> that get cash don't ... don't ... get reported ... ,
> right?
>
> Le: No, [they aren't shown] not [listed] on
> payroll...//...[6]
>
> CW:  ... so no tax filed, right?
>
> Le: ... correct ... that's something we need to discuss
> with them ahead of time, only if they agree...//...
> * * *
> Le: (Talking about people who are not on the payroll)
> There's a list ... but we just don't send it to the tax
> office ...

77.    Le and Steven Nguyen also told CW that their workers
receive their cash payments in envelopes at 1548 Dorchester, that
they pay their workers who accept cash less than the minimum
wage, and that they charge the Client Companies $9.50 per hour
for the temporary employees:

> Le: [Workers] receive their pay right here . . . we put
> the [cash] in envelopes.
> * * *
> CW: The ... the ... how much is the minimum wage that
> you are paying right now?
>
> Le: ... six-seventy-five [$6.75] ...
> * * *
> Steven Nguyen: It depends on the workers ... the
> minimum is flexible in a way ... the same way with
> payroll ... sometimes we have to pay seven fifty [7.50]
> for payroll [workers] ...

---

   [6] Double slashes (//) were used by the translator to denote
an interruption by another speaker, or words spoken
simultaneously, or almost so, with previous words.

CW:  . . . how much would you charge the company then?

Le:  Nine fifty . . .

CW:  Nine fifty . . . meaning you will handle all the insurance, workers comp?

Le:  Yeah, yeah, yeah.

CW:  If you run business in an honest way, there wouldn't be any money, huh?

Le:  Right . . . there wouldn't be any money.

78.  In the conversations with CW, Le talked about dealing in large amounts of cash using a bank insider.  She also demonstrated her knowledge of the reporting requirements of the Bank Secrecy Act:

Le:  Now...now...you know what...in this business...you have to know [to work with/have the cooperation of] people [insiders/connections] at the bank(s)...

\* \* \*

Le:  Yeah...they...they didn't allow me to do so...they didn't let me withdraw...say if they notice that you withdraw...for example...uh...ten, twenty thousand [10,000.00 to 20,000.00] a day, every day... they certainly will close [your account]  right away...

\* \* \*

Le:  ...so you know...for example when we have the 'insider' [connection], that...they will take care and be responsible for us concerning 'that' matter, you see? They wouldn't...it's like...you just need to give them the check(s), they will give you the money...it's like...you just need to make a phone call directly  to your 'insider(s)' ordering such and such amount ahead of time...they will have that amount ready for you...you only need to come and pick it up...it's going to be in a bag...you don't need to go through the secretaries, nor cashiers...that's how you would do...

37

79.  During the face-to-face meeting with Tina Le, Steven
Nguyen and Mercedes Tang, CW posed a hypothetical question about
changing names to avoid insurance premiums.  Le responded that a
company could change its name, but that it would have to be every
four or five years in order to not raise suspicion:

> CW:  Are there cases where you can change...uh...
> change...name...to avoid...
>
> Steven Nguyen:  ...you can change the name, but how
> about the insurance?...//...
>
> Le: ...//...No, you can't...only after [every] four or
> five years...
>
> CW:  ...four five years in order to change huh?  In
> case...that you don't change, well, [I meant] if you
> change, they will know it too!  If you buy another
> insurance policy, they'll know it too!
>
> Le:  Well, it'll be under the name of another person!
>
> CW:  Under another name, is that right?
>
> Le:  [But it has to be after] working a long time, four
> to five years!
>
> CW:  Yeah...
>
> Le: [after] four to five years doesn't mean that we
> change the name because of the audit!  We have another
> situation [a made-up reason/a scenario]...

* * *

38

80.  In her conversations with CW, Tina Le also admitted
that she does not follow the law in operating her temporary
employment agency:

> Le:  I do know some tricks of the trade . . . I can cut
> corners a little here and a little there, and . . .
> it's not that good [for business] when you deal
> 'straight' [being honest][7]
>                    * * *
> Le:  When you are in temp business like this, you just
> have to know what to do, if you just are so 'straight'
> [being too honest], it wouldn't work. . . .
>                    * * *
> Le:  Because if you just go straight, straight,
> straight [being honest] like that ... you might have to
> pay out of your own pocket ... yeah, you'd have to pay
> money out of your own pocket to make up for it at the
> end of the year ...

81.  As noted above, during the face-to-face meeting with
the Subjects, Mercedes Tang handed CW her Star Labor business
card, which listed her as Mercedes Luu.  Steven Nguyen claimed he
was President of the company, but CW stated that Le appeared to
be in charge of the company, and in fact Le stated as much:

> CW:  Steve is the president.
>
> TL:  He's the president.  I don't have my name in
> there.  I don't have my name listed.  I run the
> business, I do everything, I don't need to list my name
> [laughing]
>
> CW:  [also laughs] You've had experience for a long
> time, you don't need to include your name...[they both
> laughed]
>
> TL:  Because we divided our names.  Each of us
> registers his/her name in different [company].  My name
> is in another business.

---

[7] The bracketed passage is in the translator's original.

39

82.    In follow-up phone conversations that were recorded by CW, CW and Le arranged for Le to meet an undercover FBI agent posing as a prospective client (the "undercover").  CW claimed that the prospective client represented a sporting goods manufacturer that needed approximately fifty temporary employees for its facility in Central Massachusetts.  CW and Le agreed that the undercover would contact her and arrange a meeting.

83.    On January 29, 2004, the undercover met Le and Mercedes Tang at the offices of Star Labor, 1548 Dorchester Avenue, Dorchester, Massachusetts.  During the ensuing conversation, Le and Mercedes Tang told the undercover, among other things, that their company would pay for workers' compensation insurance, that they charge $9.75 per person per hour, that the company's records are located there in Star Labor's offices, that Le had been in the temporary employment business for ten years, and that they have sent three to four hundred workers to some job sites.

**Auditor Interviews**

84.    We have interviewed several insurance auditors who performed audits of the temporary employment agencies named in this affidavit.  They report that the account contact for many of the temporary employment agencies was Pham-Do Accounting.  The auditors state that when they perform an audit, one of the standard records they seek is the insured's cash disbursement journal.  That way, in theory at least, they can verify whether

40

employees have been paid in cash.  In the case of the temporary
employment agencies of the Tina Le Organization, the auditors
consistently were told by the audit contacts that a cash
disbursement journal was not available.

**Bank Records and Currency Transaction Reports**

85.  As Tina Le told CW during the recorded conversations,
the Tina Le Organization pays many of its employees in cash.
Documents provided by Client Companies reflected that some checks
issued to the Tina Le Organization were cashed at Broadway, while
others were deposited into bank accounts.  Both bank accounts of
Broadway were subpoenaed and the records relating to the Tina Le
Organization were analyzed.  These records confirmed that Client
Company checks payable to the Tina Le Organization entities have
been cashed at Broadway since at least June 2000.

86.  Investigators also conducted an analysis of the
Currency & Banking Retrieval System ("CBRS") records regarding
Currency Transaction Reports ("CTRs") filed with regard to the
companies and individuals comprising the Tina Le Organization.
Between 1996 and 2004, over 300 CTRs were filed regarding
transactions conducted by the Subjects, their agents or the Tina
Le Organization.

87.    The Broadway and CBRS records revealed that the Tina Le Organization cashed Client Company checks at Broadway as follows:

| Year | Amount |
|------|--------|
| 1996 | $179,835 |
| 1997 | $561,979 |
| 1998 | $456,611 |
| 1999 | $367,559 |
| 2000 | $905,705 |
| 2001 | $463,918 |
| 2002 | $1,583,813 |
| 2003 | $5,276,809 |
| 2004 (through October) | $3,272,730 |

I have compared the records of checks cashed at Broadway by the Tina Le Organization and the CTRs filed by Broadway, and it appears Broadway did not file accurate CTRs – and often did not file CTRs at all – on every reportable transaction for the Tina Le Organization.  Accordingly, these figures are likely lower than that actual amount of Client Company checks cashed for these years.

88.    Many of the checks cashed at Broadway bear the signatures of Tina Le, T.L., or Steven Nguyen.  Surveillance of Broadway confirmed that Le, Steven Nguyen, Misa Tang and Mercedes Tang often cashed checks, leaving Broadway with bags apparently containing cash and returning to addresses owned or controlled by

42

the Subjects in Quincy and Dorchester, Massachusetts.

89.    Information provided by CW and surveillance confirmed
that Le and Misa Tang still cash checks at Broadway, although
surveillance and CBRS records reveal that the Subjects also use
other individuals to cash Tina Le Organization checks.  For
example, in or around October 2004, CW called me from Worcester,
Massachusetts and stated that it had been at Broadway shortly
before the call to cash checks for temporary employment agencies.
While CW was in the office of Broadway's owner, Andrew Feldman, a
person CW believed to be Le called Feldman.  A short time later,
CW saw Le arrive at Broadway in her 2004 Jaguar.  A Broadway
employee brought two bags, which CW believed to contain cash, to
Le's car and placed them in the back seat.  Approximately two
hours later, I observed Le arrive at residence at 301 Adams
Street, Quincy, Massachusetts, where she removed bags from the
back seat of her car and entered the house.

**Interviews of Alleged Subcontractors**

90.    The investigation also revealed that the Tina Le
Organization claimed to employ subcontractors to furnish
temporary employees.  For example, for 1997 and 1998, First State
prepared 1099s listing approximately $2,000,000 in payments to
subcontactors.  Bank records revealed that the checks used to pay
the alleged subcontractors were payable to cash, Le, Mercedes
Tang, Steven Nguyen and/or the subcontractors, and some had the

43

name of the subcontractor in the memo section of the check.
These checks were written in amounts less than $10,000, and they
were then cashed by Le, Mercedes Tang and Steven Nguyen.  In many
instances, several checks were cashed on the same day or on
consecutive days.

91.    I and other investigators located and interviewed some
of these alleged subcontractors.  None of the individuals
interviewed had ever operated temporary employment agencies, and
none of the individuals supplied workers to the Subjects or the
Tina Le Organization.  Moreover, none of those individuals had
ever seen the 1099s or received the payments listed on the 1099s.
In fact, one of the alleged subcontractors laughed at the
suggestion that First State had paid him almost $3 million in
1996 and 1997.  Our interviews of the alleged "subcontractors"
also revealed that the Subjects or their agents had tricked these
individuals into signing documents purporting to substantiate
their status as subcontractors, and one individual was paid
between $300 and $400 per week for signing such a form.  By
subscribing to these false 1099s, the temporary employment
agencies failed to pay their payroll taxes.

44

**Interview of Nancy Biscaldi**

92.    Nancy Biscaldi, a former Wonder Fast employee, told
investigators that, when Tina Le took over Bay State (which had
been Wonder Fast months earlier) in 1999, Le asked Biscaldi to
continue to work as a sales representative.  Biscaldi stated that
she only worked for Le for approximately two weeks.  According to
Biscaldi, Le told her that she paid employees in cash.  Biscaldi
stated she refused to be paid in cash and left the position.

**Items Recovered from Trash**

93.    From April 2004 to October 2004, Postal Inspector
Hickey, and I retrieved the trash that had been left at the curb
for weekly pickup in front of the Subjects' residence at 301
Adams Street, Quincy, Massachusetts ("301 Adams Street").  As set
forth above, the trash contained business records, including
invoices, contracts, correspondence, and time sheets, for First
State, T. Nguyen, Mass Labor, Labor Staffing and Star Labor.

94.    The trash also contained evidence that the Tina Le
Organization has been paying its employees in cash, that the cash
is being distributed from 301 Adams Street, and that records of
cash payments to employees are being kept at 301 Adams Street.

95.    For example, we identified several time sheets listing
employees, their hourly rates, their hours worked, their total
pay, whether they were paid some portion of their pay by check,
and how much cash is owed to each employee.

45

96.    In addition, we located ledgers titled "Tina Account,"
on which someone has kept a running tally of deposits and
withdrawals.    Based on the correspondence between receipts from
Broadway found in the 301 Adams Street trash and entries in the
ledgers, I believe the ledgers are used to record and keep track
of the amount of cash on hand at 301 Adams Street.

97.    We also discovered numerous "cash bands," thin paper
bands that banks commonly use to bind cash.    The bands included
denominations ranging from $100 to $10,000, as follows:

| **DATE** | **TOTAL CASH BANDS** |
|---|---|
| 4/24/2004 | $59,700 |
| 5/21/2004 | $96,400 |
| 5/28/2004 | $17,800 |
| 6/5/2004 | $15,300 |
| 6/11/2004 | $4,200 |
| 6/24/2004 | $54,900 |
| 7/2/2004 | $30,300 |
| 7/16/2004 | $114,300 |
| 8/6/2004 | $34,600 |
| 8/13/2004 | $89,630 |
| 8/20/2004 | $68,310 |
| 8/27/2004 | $38,330 |
| 9/3/2004 | $49,800 |
| 9/11/2004 | $28,800 |
| 9/17/2004 | $71,410 |
| 9/24/2004 | $106,520 |
| 10/8/2004 | $2,000 |
| 10/16/2004 | $135,230 |
| 10/22/2004 | $95,500 |
| 10/29/2004 | $71,300 |
| 11/5/2004 | $23,100 |
| 11/13/2004 | $179,930 |

**TOTAL**                $1,387,360

98. The amount of cash reflected by the bands is consistent with the amount cashed each week by Star Labor at Broadway Check Cashing. That the cash bands are found in the trash at 301 Adams Street, as opposed to Star Labor's offices, suggests that the cash to be paid to Star Labor's employees is divvied up at 301 Adams Street.

99. We also retrieved a number of opened white envelopes addressed to employees. Noted on each of these envelopes is an amount of money. These envelopes were torn as if someone had removed their contents. The discovery of these envelopes and the cash bands in the trash at 301 Adams Street, coupled with the evidence, described above, that indicates that the Tina Le Organization pays its employees in cash, suggest that the cash for these payments is being divvied up at 301 Adams Street.

**Summary of Insurance Fraud**

100. Using bank records, CTRs and Client Company information, I have calculated the estimated actual revenue of the Tina Le Organization since 1995. Set forth in **Exhibit 2**, which is incorporated herein by reference, is a chart that reflects the differences between the number of Client Companies and insurance "exposure" reported by the companies in whose name the Tina Le Organization operated, and the actual figures. The term "exposure" refers to the annual payroll of the employees to be covered by workers' compensation insurance. Included in this

48

figure are both the total wages of employees, as well as payments
made to workers characterized as independent contractors or "1099
employees" (in reference to IRS Form 1099), who are indeed
employees, but are responsible for withholding their own tax
payments.

101. For the period after 2002, we estimated the number of
"actual client companies" and the actual exposure based on the
checks the Subjects cashed at Broadway.  We determined the number
of client companies simply by counting the number of companies
that had written checks to the Subject's temp agencies.  The
total amount paid as reflected on the checks represented the
company's revenue (again to the extent we had complete records).
Based on the revenue figures for each audit period, we determined
"actual exposure" (or, again, the total payroll).  We did this by
estimating the percentage of each company's revenue that is spent
on payroll.  Based on Tina Le's statements to the CW, and records
recovered from the trash at 301 Adams Street listing rates of pay
for temporary workers, I estimate that the percentage of revenue
spent on payroll for the companies is 73.68 percent.  Given this
percentage, by way of illustration, if a temporary employment
agency received $1 million in annual revenue, it would have paid
its employees approximately $736,800, which would be its "actual
exposure".  Investigator Faragi informs me that this percentage
is consistent with his experience in determining the amount of

49

payroll of other fraudulent temp agencies.

102. Although we do not yet have all of the bank records
that would enable us to determine exactly how much revenue each
of these temporary employment agencies received, and in turn, how
much they paid their employees, the records we have received
reveal a vast under reporting of payroll to their workers'
compensation auditors.  Because we have yet to receive all of the
records, however, in both the "actual clients" and the "estimated
actual exposure" columns, I state that each figure is "at least"
what is indicated.

103. The revenue figures before 2002 are derived from
responses to questionnaires that we sent to approximately seventy
percent of Client Companies in June 2001, in which we asked,
among other things, the number of client companies and total
payments to each temp agency.  There were certain Client
Companies whom we did not believe we could approach
confidentially.[8]  Thus, the "actual exposure" figures are likely
significantly lower than the actual payroll both because we did
not survey only surveyed seventy percent of the Client Companies
we knew about, and because we may not have known about all Client
Companies.  For these reasons, again, in both the "actual
clients" and the "estimated actual exposure" columns, I state

---

[8] We have not yet obtained Client Company records generated
after June 2001.

50

that each figure is "at least" what is indicated.

104. In addition, the revenue information from the Client Companies, that is, the information before 2002, is based on the calendar year. Therefore, the "actual exposure" and "reported exposure" periods may not line up exactly.

105. Notwithstanding their practice of grossly under reporting payroll, as reflect in detail in Exhibit 2, the temporary employment agencies of the Tina Le Organization held themselves out to Client Companies as being fully covered by workers' compensation insurance. We have conducted numerous interviews of the representatives of the Client Companies that directly interacted with the temporary employment companies. Invariably they have told us that the temporary employment agencies presented them with certificates they received from the insurance companies, and claimed that their employees were fully insured.[9] Client Company representatives also told us that they would not have hired temporary employees from the Tina Le Organization if the Tina Le Organization had not been covered by workers' compensation insurance.

106. Based upon my knowledge, training, experience, and the facts set forth in this Affidavit, I have probable cause to believe, and do believe, that Tina "Tien" Le, Mercedes Tang, Misa

---

[9] Because the certificates are issued by the insurers at the beginning of the audit period, they do not indicate the number of covered employees.

51

Tang and Steven Nguyen have: defrauded workers' compensation
insurers, by means of the U.S. mail, in violation of Title 18,
United States Code, Section 1341 (mail fraud), defrauded workers'
compensation insurers by means of interstate wire transmission in
violation of Title 18, United States Code, Section 1343 (wire
fraud); evaded currency reporting requirements, in violation of
Title 31, United States Code, Section 5324; committed money
laundering, in violation of Title 18, United States Code,
Sections 1956 and 1957; and/or conspired to commit the same, in
violation of Title 18, United States Code, Section 371.

## FORFEITABILITY OF THE DEFENDANT PROPERTIES

107. As set forth above, I have probable cause to believe that the Subjects and the Tina Le Organization have engaged in a scheme to defraud insurance carriers in obtaining worker's compensation insurance since at least November 1995. Client Company representatives interviewed by law enforcement officers stated that their companies would not have retained the Tina Le Organization without proof of workers compensation insurance coverage. If the Tina Le Organization had not defrauded the insurers and thereby obtained workers compensation insurance coverage, the Client Companies would not have hired the Tina Le Organization and its temporary workers, and they would not have paid the Tina Le Organization for temporary employment services. Accordingly, all funds paid to the Tina Le Organization in exchange for temporary employment services constitute or are derived from proceeds obtained, directly or indirectly, as the result of violations of 18 U.S.C. §§ 1341 and/or 1343.

108. As set forth in Paragraphs 88 and 89 above, law enforcement officers and/or the CW have observed Tina Le, Misa Tang, Mercedes Tang and Steven Nguyen at Broadway on a number of occasions, and bank records relating to Broadway revealed that the Tina Le Organization has cashed Client Company checks at Broadway since at least June 2000. Further, as set forth in Paragraphs 76 through 78 above, during the consensually recorded

53

conversations between Tina Le, Mercedes Tang, Steven Nguyen and
CW, Le admitted that her Organization pays its employees in cash,
talked about dealing in large amounts of cash using a bank
insider, and demonstrated her knowledge of the reporting
requirements of the Bank Secrecy Act.  Accordingly, I have
probable cause to believe that all deposits into accounts held in
the names of the Tina Le Organization entities and the Subjects
constitute or are derived from Client Company funds.

**I.    301 ADAMS**

109. According to records on file with the Norfolk County
Registry of Deeds, Tina Le purchased 301 Adams on December 3,
1998 for $325,000.  Mortgage records reflect that Le paid
$125,000 towards the purchase price, and obtained a mortgage from
North American Mortgage Company ("North American") in the amount
of $200,000.  On December 17, 1998, Le deeded 301 Adams to the
Adams Street Realty Trust, of which she was the sole trustee.

110. I have reviewed mortgage and bank records relating to
Le's purchase of 301 Adams.  As set forth below, those records
indicate that Le used funds constituting or derived from Client
Company funds, and funds involved in violations of 18 U.S.C. §§
1956 and/or 1957, for the deposit and down payment on 301 Adams.

**A.    The Deposit On 301 Adams**

111. In connection with this investigation, I have reviewed
records relating to Tina Le's Asian American Bank checking

54

account number 210008421 (the "8421 Account"). Those records
revealed that, on October 6, 1998, Le wrote a $15,250 check,
drawn on the 8421 Account, to the Century 21 Abigail Adams Agency
as a deposit on 301 Adams (the "301 Adams Deposit Check"). The
301 Adams Deposit Check cleared the 8421 Account on October 8,
1998. For the reasons set forth below, I have probable cause to
believe that certain funds on deposit in the 8421 Account on
October 8, 1998 constituted or were derived from Client Company
funds, and that the 8421 Account was involved in violations of 18
U.S.C. §§ 1956 and/or 1957. A chart depicting the following
transactions is attached as Exhibit 3.

112. Le opened the 8421 Account on September 14, 1998.
Between September 14, 1998 and October 8, 1998 (the date on which
the 301 Adams Deposit Check cleared the 8421 Account), Le
deposited approximately $37,080 into the 8421 Account.

113. Le's deposits into the 8421 Account during the relevant
time period included approximately $21,215 transferred from Asian
American Bank Account number 110132743 (the "2743 Account"), held
in the name of T. Nguyen Temporary, into the 8421 Account as
follows:

        a.    $1,215 transferred from the 2743 Account into the
             8421 Account on September 14, 1998; and

55

b.    check number 1023, in the amount of $20,000, drawn

on the 2743 Account, deposited into the 8421

Account on October 5, 1998.

IRS Special Agent ("SA") Skene has reviewed records relating to

the 2743 Account.  The 2743 Account was opened on August 14,

1998.  On October 3, 1998, check number 1046, in the amount of

$40,000, drawn on First State's Asian American Bank account

number 210007886 (the "7886 Account"), was deposited into the

2743 Account.  SA Skene also has reviewed records relating to the

7886 Account, and all deposits into the 7886 Account on or before

October 3, 1998 were comprised of Client Company checks.

Accordingly, check number 1046 drawn on the 7886 Account and

deposited into the 2743 Account constituted or was derived from

Client Company funds.  All other funds deposited into the 2743

Account between August 14, 1998 and October 5, 1998 were

comprised of Client Company checks.  Accordingly, the $21,215

transferred from the 2743 Account to the 8421 Account prior to

October 8, 1998: (1) constituted or was derived from Client

Company funds, and (2) constituted property involved in

violations of 18 U.S.C. §§ 1956 and/or 1957.  Further, the 8421

Account constituted property involved in money laundering

transactions in violation of 18 U.S.C. §§ 1956 and/or 1957 as a

result of the transfers from the 2743 Account.

114. Le's deposits into the 8421 Account during the relevant

56

time period also included approximately $6,920 transferred from
Asian American Bank Account number 210007886 (the "7886
Account"), held in the name of First State, into the 8421 Account
as follows:

      a.    check number 1015, in the amount of $2,000, drawn
               on the 7886 Account, deposited into the 8421
               Account on September 23, 1998;

      b.    check number 1035, in the amount of $2,700, drawn
               on the 7886 Account, deposited into the 8421
               Account on September 29, 1998;

      c.    check number 1039, in the amount of $380, drawn on
               the 7886 Account, deposited into the 8421 Account
               on September 30, 1998;

      d.    check number 1041, in the amount of $300, drawn on
               the 7886 Account, deposited into the 8421 Account
               on September 30, 1998;

      e.    check number 1038, in the amount of $460, drawn on
               the 7886 Account, deposited into the 8421 Account
               on September 30, 1998;

      f.    check number 1040, in the amount of $280, drawn on
               the 7886 Account, deposited into the 8421 Account
               on September 30, 1998;

      g.    check number 1037 in the amount of $480, drawn on
               the 7886 Account, deposited into the 8421 Account

on September 30, 1998[10]; and

h.    $320 transferred from the 7886 account into the

8421 Account on October 1, 1998.

SA Skene has reviewed records relating to the 7886 Account. The

7886 Account was opened on August 19, 1998, and all deposits into

the 7886 Account on or before October 1, 1998 were comprised of

Client Company checks. Accordingly, all funds transferred from

the 7886 Account to the 8421 Account on or before October 1,

1998: (1) constituted or were derived from Client Company funds,

and (2) constituted property involved in violations of 18 U.S.C.

§ 1956. Further, the 8421 Account constituted property involved

in violations of 18 U.S.C. § 1956 as a result of the transfers

from the 7886 Account.

115. Le's deposits into the 8421 Account during the relevant

time period also included $7,435 deposited as follows:

a.    a check from "Dem Nguyen", in the amount of

$3,115.58, deposited into the 8421 Account on

September 28, 1998;

b.    a check from "Mary Phuong Duong", in the amount of

$2,800, deposited into the 8421 Account on

September 28, 1998; and

---

[10] The five First State checks Le deposited into her 8421
Account on September 30, 1998 were paychecks made payable to
people other than Le, and then endorsed to Le, indicating that
she cashed checks for First State employees using the 8421
Account.

      c.   a check from T & T Sewing, Inc. #2 for "Sep. Pay

           Month", in the amount of $1,520, deposited into

           the 8421 Account on October 1, 1998.

North American records relating to the December 1998 mortgage on

301 Adams included a December 1, 1998 letter from Le, stating

that she is an employee as well as owner of First State, and that

the checks she deposited on September 28, 1998 (items (a) and (b)

above) were "from services provided by 1st State Labor Services

which was my income." In addition, the investigation revealed

that T & T Sewing, Inc. (item (c) above) was a Client Company of

the Tina Le Organization. Accordingly, I have probable cause to

believe that these deposits: (1) constituted or were derived from

Client Company funds, and (2) constituted property involved in

violations of 18 U.S.C. § 1956. Further, I have probable cause

to believe that the 8421 Account constituted property involved in

violation of 18 U.S.C. § 1956 as a result of these deposits.

    116. Based on the foregoing, I have probable cause to

believe that at least $35,571 of the $37,080 deposited into the

8421 Account on or before October 8, 1998 constituted or was

derived from Client Company funds, and constituted property

involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or

property traceable to such property. I further have probable

cause to believe that the 8421 Account constituted property

involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or

property traceable to such property, at the time the 301 Adams

Deposit Check cleared the 8421 Account. Accordingly, I have

probable cause to believe that: (1) the 301 Adams Deposit Check

constituted or was derived from proceeds traceable to violations

of 18 U.S.C. §§ 1341 and/or 1343, and/or (2) the 301 Adams

Deposit Check constituted property involved in violations of 18

U.S.C. §§ 1956 and/or 1957, or property traceable to such

property.

**B.    The Down Payment On 301 Adams**

117. Records relating to the 8421 Account revealed that, on

December 4, 1998, Le purchased Asian American Bank Official Check

number 8892, in the amount of $116,742.76, using check number

1023, drawn on the 8421 Account. Mortgage records revealed that

the cash due from Le upon the December 4, 1998 closing for 301

Adams was $116,742.76. Accordingly, I believe that Le made the

down payment on 301 Adams with Asian American Bank Official Check

number 8892 (the "301 Adams Down Payment Check"). For the

reasons set forth below, I have probable cause to believe that

certain funds on deposit in the 8421 Account on December 4, 1998

constituted or were derived from Client Company funds, and that

the 8421 Account constituted property involved in violations of

18 U.S.C. §§ 1956 and/or 1957. A chart depicting the following

transactions is attached as Exhibit 4.

118. Between September 14, 1998 and December 4, 1998, Le deposited approximately $162,173 into the 8421 Account. As set forth in Paragraph 116 above, I have probable cause to believe that at least $35,570 of the $37,080 deposited into the 8421 Account on or before October 8, 1998 constituted or was derived from Client Company funds.

119. In addition, on October 13, 1998, Le deposited check number 1041, drawn on the 2743 Account, in the amount of $105,000, into the 8421 Account. My review of North American loan and Asian American Bank records revealed that Le also transferred $5,000 from the 2743 Account into the 8421 Account on December 3, 1998.[11] As stated previously, SA Skene has reviewed the records relating to the 2743 Account, which was opened on August 14, 1998. Between August 14, 1998 and December 3, 1998, $640,801 was deposited into the 2743 Account. Aside from the $40,000 transfer from the 7886 Account, which as set forth in Paragraph 113 was derived entirely from Client Company funds, and the October 12, 1998 deposit of a $9,200 Asian American Bank check, all deposits into the 2743 Account on or before December

---

[11] Although the bank was unable to locate any documents relating to the December 3, 1998 $5,000 deposit item, the North American mortgage records included three completed Gift Letter Forms regarding three "gifts" from Tien D. Nguyen. Two of the Gift Letter Forms related to the transfers from the 2743 Account into the 8421 Account described in Paragraph 113 above. The third Gift Letter Form related to a $5,000 transaction. The December 3, 1998 deposit was the only deposit for $5,000 into the 8421 Account during the relevant time period.

3, 1998 were comprised of Client Company checks.  Accordingly,
$631,601 of the $640,801 deposited into the 2743 Account on or
before December 3, 1998 constituted or was derived from Client
Company funds, and the 2743 Account constituted property involved
in violations of 18 U.S.C. §§ 1956 and/or 1957.  Accordingly, I
have probable cause to believe that the funds transferred from
the 2743 Account to the 8421 Account on October 13, 1998 and
December 3, 1998: (1) constituted or were derived from Client
Company funds, and/or (2) constituted property involved in
violations of 18 U.S.C. §§ 1956 and/or 1957.  Further, the 8421
Account constituted property involved in violations of 18 U.S.C.
§§ 1956 and/or 1957 as a result of those transfers.

120.  On November 18, 1998, Le deposited twelve checks,
totaling approximately $2,880, drawn on First State Labor's 7886
Account into the 8421 Account.  As set forth above, SA Skene has
reviewed records relating to the 7886 Account.  Prior to November
18, 1998, all deposits into the 7886 Account were comprised of
Client Company checks, cash and transfers from the 2743 Account.
For the reasons set forth in Paragraph 108 above, I have probable
cause to believe the cash deposits into the 7886 Account
constituted or were derived from Client Company funds.  As set
forth in Paragraph 119 above, SA Skene also has reviewed records
relating to the 2743 Account, and I have probable cause to
believe that $631,601 of the $640,801 deposited into the 2743

62

Account on or before December 3, 1998 constituted or was derived from Client Company funds, and that the 2743 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957. Accordingly, I have probable cause to believe that the funds transferred from the 2743 Account to the 7886 Account prior to November 18, 1998: (1) constituted or were derived from Client Company funds, and/or (2) constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957. Further, the 7886 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957 as a result of those transfers. Therefore, I have probable cause to believe that the funds transferred from the 7886 Account to the 8421 Account on November 18, 1998: (1) constituted or were derived from Client Company funds, and/or (2) constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957. Further, the 8421 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957 as a result of those deposits.

121. On December 2, 1998, Le deposited six checks, totaling approximately $1,320, drawn on Mass Labor's Massachusetts Co-Operative Bank account number 868607012 (the "7012 Account"), into the 8421 Account. Three of those checks were made payable to Mercedes Tang and endorsed to Tina Le, and three of those checks were made payable to Tina Le. SA Skene has reviewed records relating to the 7012 Account. The 7012 Account was

opened on October 28, 1998, and there were only two deposits made

to the 7012 Account prior to December 2, 1998: on October 28,

1998, $100 in cash was deposited to open the 7012 Account, and on

November 30, 1998, $2,150 was transferred from Mass Labor's

Massachusetts Co-Operative Bank account number 868606999 (the

"6999 Account") into the 7012 Account.   SA Skene also has

reviewed records relating to the 6999 Account.   The 6999 Account

was opened on October 28, 1998, and on or before November 30,

1998, $7,300 was deposited into the 6999 Account.   All but $300

of those deposits consisted of checks drawn on the 2743 Account.

As set forth in Paragraph 119 above, all but $9,200 deposited

into the 2743 Account on or before November 30, 1998 constituted

or was derived from Client Company funds, and the 2743 Account

constituted property involved in violations of 18 U.S.C. §§ 1956

and/or 1957.   Accordingly, all funds transferred from the 2743

Account to the 6999 Account on or before November 30, 1998: (1)

constituted or were derived from Client Company funds, and/or (2)

constituted property involved in violations of 18 U.S.C. § 1956.

Further, the 6999 Account constituted property involved in

violations of 18 U.S.C. § 1956 as a result of the transfers from

the 2743 Account.   Hence, all funds transferred from the 6999

Account to the 7012 Account prior to December 2, 1998: (1)

constituted or were derived from Client Company funds, and/or (2)

constituted property involved in violations of 18 U.S.C. § 1956,

64

and the 7012 Account constituted property involved in violations of 18 U.S.C. § 1956 as a result of those transactions.   Therefore all funds transferred from the 7012 Account to the 8421 Account on December 2, 1998: (1) constituted or were derived from Client Company funds, and/or (2) constituted property involved in violations of 18 U.S.C. § 1956.   Finally, the 8421 Account constituted property involved in violations of 18 U.S.C. § 1956 as a result of those transactions.

122. Based on the foregoing, I have probable cause to believe that at least $149,770 of the $162,173 deposited into the 8421 Account between September 14, 1998 and December 4, 1998 constituted or was derived from Client Company funds, and/or constituted property involved in violations of 18 U.S.C. § 1956 and/or 1957, or property traceable to such property.   I further have probable cause to believe that the 8421 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property, at the time the 301 Adams Down Payment Check cleared the 8421 Account.   Accordingly, I have probable cause to believe that: (1) the 301 Adams Down Payment Check constituted or was derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 and/or 1343, and/or (2) the 301 Adams Down Payment Check constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property.

65

C.    **Forfeitability Of 301 Adams**

123. Based on the foregoing, I have probable cause to believe that 301 Adams is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 and/or 1343.  I further have probable cause to believe that 301 Adams is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property.

II.  **1548 DORCHESTER**

124. According to records on file with the Suffolk County Registry of Deeds, Tina Le and Steven Nguyen purchased 1548 Dorchester on February 28, 2000 for $450,000.[12]  Mortgage and bank records reflect that Steven Nguyen paid $26,000 in deposits on 1548 Dorchester, and then made a down payment in the amount of $217,843.69.  A mortgage in favor of Equity One Inc. ("Equity One"), in the amount of $351,900, was recorded on February 28, 2000.[13]

---

[12] In connection with a September 2003 mortgage refinancing, Tina Le and Steven Nguyen deeded 1548 Dorchester to Tina Le individually.

[13] Because 1558 Dorchester needed repairs at the time of purchase, Le and Steven Nguyen held back $150,000 for repairs. Accordingly, the amount due from the borrower was greater than the purchase price plus settlement charges.

125. I have reviewed mortgage and bank records relating to Le's and Steven Nguyen's purchase of 1548 Dorchester. As set forth below, those records indicate that Le and Steven Nguyen used funds constituting or derived from Client Company funds, and funds involved in money laundering violations, for the deposits and down payment on 1548 Dorchester.

### A.    The Deposits On 1548 Dorchester

126.  Steven Nguyen used check number 1153, made payable to R. E. Hill & Company, Inc. and drawn on his Fleet Bank account number 501512922 (the "2922 Account"), to make a $1,000 deposit on 1548 Dorchester on January 7, 2000. Steven Nguyen used check number 1167, made payable to R. E. Hill & Company, Inc. and drawn on his 2922 Account, to make a further $24,000 deposit on 1548 Dorchester on February 2, 2000. Check number 1153 and 1167 (the "1548 Dorchester Deposit Checks") cleared the 2922 Account on February 7, 2000. For the reasons set forth below, I have probable cause to believe that certain funds on deposit in the 2922 Account on February 7, 2000 constituted or were derived from Client Company funds, and that the 2922 Account was involved in violations of 18 U.S.C. §§ 1956 and/or 1957. A chart depicting the following transactions is attached as Exhibit 5.

127. The balance of Steven Nguyen's 2922 Account on November 30, 1999 was approximately $482. Between November 30, 1999 and

67

February 7, 2000, Steven Nguyen deposited approximately $220,582 into the 2922 Account.

128.   Steven Nguyen's cash deposits into the 2922 Account during this time period totaled $10,000.  For the reasons set forth in Paragraph 108 above, I have probable cause to believe that the cash deposits into the 2922 Account constituted or were derived from Client Company funds.

129. Between November 30, 2000 and February 7, 2000, Steven Nguyen transferred approximately $29,640 from Mass Labor's Asian American Bank account number 210018008 (the "8008 Account") into his 2922 Account as follows:

a.   Check number 1012, drawn on the 8008 Account, in the amount of $10,000, deposited on January 19, 2000;

b.   Asian American Bank Official Check number 11040, in the amount of $9,750, which bank records reflect was purchased on February 2, 2000 with a check drawn on the 8008 Account, deposited on February 3, 2000; and

c.   Asian American Bank Official Check number 11041, in the amount of $9,890, which bank records reflect was purchased on February 2, 2000 with with a check drawn on the 8008 Account, deposited on February 3, 2000.

68

SA Skene has reviewed records relating to the 8008 Account.  The 8008 Account was opened on December 31, 1999, and all deposits into the 8008 Account prior to February 2, 2000 were comprised of Client Company checks.  Accordingly, all funds transferred from the 8008 Account to the 2922 Account between December 31, 1999 and February 2, 2000: (1) constituted or were derived from Client Company funds, and (2) constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957.  Further, the 2922 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957 as a result of these transfers.

130. Between November 30, 1999 and February 7, 2000, Steven Nguyen also transferred $30,000 from Bay State's Bank Boston account number 26832355 (the "2355 Account") into his 2922 Account as follows:

    a.   Check number 1087, drawn on the 2355 Account, in the amount of $9,100, deposited on January 24, 2000;

    b.   Check number 1088, drawn on the 2355 Account, in the amount of $8,400, deposited on January 24, 2000;

    c.   Check number 1089, drawn on the 2355 Account, in the amount of $5,200, deposited on January 26, 2000; and

      d.    Check number 1090, drawn on the 2355 Account, in

              the amount of $7,300, deposited on January 28,

              2000.

SA Skene has reviewed records relating to the 2355 Account.  The

2355 Account was opened on December 31, 1999, and all deposits

into the 2355 Account prior to January 28, 2000 were comprised of

Client Company checks and cash.  For the reasons set forth in

Paragraph 108 above, I have probable cause to believe that the

cash deposits into the 2355 Account constituted or were derived

from Client Company funds.  Accordingly, all funds transferred

from the 2355 Account to the 2922 Account between December 31,

1999 and January 28, 2000: (1) constituted or were derived from

Client Company funds, and (2) constituted property involved in

violations of 18 U.S.C. § 1956.  Further, the 2922 Account

constituted property involved in violations of 18 U.S.C. § 1956

as a result of these transfers.

131. Based on the foregoing, I have probable cause to

believe that at least $69,640 of the $220,582 deposited into the

2922 Account between November 30, 2000 and February 7, 2000

constituted or was derived from Client Company funds, and

constituted property involved in violations of 18 U.S.C. §§ 1956

and/or 1957, or property traceable to such property.  I further

have probable cause to believe that the 2922 Account constituted

property involved in violations of 18 U.S.C. §§ 1956 and/or 1957,

or property traceable to such property, at the time the 1548

Dorchester Deposit Checks cleared.  Accordingly, I have probable

cause to believe that: (1) the 1548 Dorchester Deposit Checks

constituted or were derived from proceeds traceable to violations

of 18 U.S.C. §§ 1341 and/or 1343, and/or (2) the 1548 Dorchester

Deposit Checks constituted property involved in violations of 18

U.S.C. §§ 1956 and/or 1957, or property traceable to such

property.

### B.   The Down Payment On 1548 Dorchester

132. Steven Nguyen used check number 1170, drawn on his 2922

Account, to make an additional down payment in the amount of

$217,843.69 on 1548 Dorchester (the "1548 Dorchester Down Payment

Check").  The 1548 Dorchester Down Payment Check cleared the 2922

Account on February 25, 2000.  For the reasons set forth below, I

have probable cause to believe that certain funds on deposit in

the 2922 Account on February 25, 2000 constituted or were derived

from Client Company funds, and that the 2922 Account was involved

in violations of 18 U.S.C. §§ 1956 and/or 1957.  A chart

depicting the following transactions is attached as Exhibit 6.

133. As set forth above, the balance of Steven Nguyen's 2922

Account on November 30, 1999 was approximately $482.  Between

November 30, 1999 and February 25, 2000, Steven Nguyen deposited

approximately $305,685 into the 2922 Account.  As set forth in

Paragraphs 131 above, at least $69,640 of the funds deposited

71

into the 2922 Account between November 30, 1999 and February 7, 2000 constituted or were derived from Client Company funds.

134. In addition, on February 10, 2000, Steven Nguyen deposited Asian American Bank Official Check number 11047, in the amount of $9,750.29, which bank records reflect was purchased on February 8, 2000 with a check drawn on the 8008 Account, into the 2922 Account.  The 8008 Account was opened on December 31, 1999, and all deposits into the 8008 Account on or before February 8, 2000 were comprised of Client Company checks.  Accordingly, all funds transferred from the 8008 Account to the 2922 Account on February 8, 2000: (1) constituted or were derived from Client Company funds, and (2) constituted property involved in violations of 18 U.S.C. § 1956.  Further, the 2922 Account constituted property involved in violations of 18 U.S.C. § 1956 as a result of this transfer.

135. On February 14, 2000, Steven Nguyen deposited check number 1105, drawn on the 2355 Account, in the amount of $7,300, into the 2922 Account.  SA Skene has reviewed records relating to the 2355 Account.  The 2355 Account was opened on July 12, 1999, and all deposits into the 2355 Account prior to February 14, 2000 were comprised of Client Company checks and cash.  For the reasons set forth in Paragraph 108 above, I have probable cause to believe that the cash deposits into the 2355 Account constituted or were derived from Client Company funds.

72

Accordingly, all funds transferred from the 2355 Account to the 2922 Account on February 14, 2000: (1) constituted or were derived from Client Company funds, and (2) constituted property involved in a violation of 18 U.S.C. § 1956. Further, the 2922 Account constituted property involved in a violation of 18 U.S.C. § 1956 as a result of this transaction.

136. Based on the foregoing, I have probable cause to believe that at least $86,690 of the $305,685 deposited into the 2922 Account between November 30, 1998 and February 25, 2000 constituted or was derived from Client Company funds, and constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property. I further have probable cause to believe that the 2922 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property, at the time the 1548 Dorchester Down Payment Check cleared. Accordingly, I have probable cause to believe that: (1) the 1548 Dorchester Down Payment Check constituted or was derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 and/or 1343, and/or (2) the 1548 Dorchester Down Payment Check constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property.

73

### C.    Forfeitability Of 1548 Dorchester

137. Based on the foregoing, I have probable cause to believe that 1548 Dorchester is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 and/or 1343.   I further have probable cause to believe that 1548 Dorchester is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property.

### III. 204 NORTH MONTELLO

138. According to records on file with the Plymouth County Registry of Deeds, DL Group, L.L.C. ("DL Group") purchased 204 North Montello on October 26, 2004 for $1,050,000.   Those records also reflect that a $577,500 mortgage in favor of the former owner of 204 North Montello, Steven A. Rubin, trustee of the SA Rubin Realty Trust, was recorded on October 27, 2004.

139. According to records on file with the Secretary of the Commonwealth of Massachusetts, Corporations Division, DL Group was organized on October 22, 2004, and its sole manager is Tina Le.

140. During trash intercepts of 301 Adams, investigators discovered one page of a "Purchase and Sale Agreement Dated April 29, 2004 Between Steven A. Rubin, Trustee of the SA Rubin Realty

Trust as Seller and Tina T. Le as Buyer". According to this document, $52,500 of the purchase price for 204 North Montello was paid as a deposit, and $420,000 was to be paid at the time of delivery of the deed on October 26, 2004.

141. I have reviewed Tina Le's bank records as they relate to DL Group's purchase of 204 North Montello. As set forth below, those records indicate that Le used funds constituting or derived from Client Company funds, funds traceable to property involved in structuring violations, and funds involved in violations of 18 U.S.C. §§ 1956 and/or 1957, for the deposit and down payment on 204 North Montello.

**A.    The Deposits On 204 North Montello**

142. Bank records revealed that Tina Le paid the $52,500 deposit on 204 North Montello using funds on deposit in her Citizen's Bank checking account number 1109269207 (the "9207 Account") as follows:

   a.    check number 243, in the amount of $1,000, payable to Wluka Real Estate with the memo "204 N. Montelle St, Brockton, MA"; and

   b.    check number 253, in the amount of $51,500, payable to Wluka Real Estate with the memo "Brockton Property",

(collectively, the "204 North Montello Deposit Checks"). The 204 North Montello Deposit Checks both cleared the 9207 Account on

May 4, 2004.  For the reasons set forth below, I have probable

cause to believe that certain funds on deposit in the 9207

Account on May 4, 2004 constituted or were derived from Client

Company funds, that certain funds on deposit in the 9207 Account

on May 4, 2004 were traceable to property involved in structured

transactions, and that the 9207 Account was involved in

violations of 18 U.S.C. §§ 1956 and/or 1957.  A chart depicting

the following transactions is attached as Exhibit 7.

143. Le opened the 9207 Account on June 20, 2003 and it was

closed on August 11, 2004.  Between June 20, 2003 and May 4,

2004, Le deposited approximately $420,219 into the 9207 Account.

144. Le's cash deposits into the 9207 Account between June

20, 2003 and May 4, 2004 totaled approximately $173,628.  For the

reasons set forth in Paragraph 108 above, I have probable cause

to believe that these cash deposits constituted or were derived

from Client Company funds.

145. Based on my review of Le's bank records, the

consensually recorded conversations between Le and CW described

in Paragraph 78 above, and my training and experience, I also

believe that Le structured at least six of those cash deposits to

avoid the reporting requirements of 31 U.S.C. § 5313(a),

including:

    a.    $10,000 deposited on February 12, 2004;

    b.    $9,900 deposited on April 5, 2004;

    c.    $7,000 deposited on April 5, 2004;

    d.    $9,000 deposit on April 6, 2004;

    e.    $9,000 deposited on April 7, 2004; and

    f.    $9,000 deposited on April 12, 2004.

146. Between June 20, 2003 and May 4, 2004, Le also deposited approximately $9,548 in checks drawn on Star Labor's Sovereign Bank account number 64004986077 (the "6077 Account") into the 9207 Account. I have reviewed bank records relating to the 6077 Account, and $399,911 of the $406,611 deposited into the 6077 Account between January 15, 2003 and April 5, 2004 (the date on which the 6077 Account was closed) was comprised of cash and/or Client Company checks. For the reasons set forth in Paragraph 108 above, I have probable cause to believe that the cash deposits into the 6077 Account constituted or were derived from Client Company funds. Accordingly, I have probable cause to believe that $399,911 of the $406,611 deposited into the 6077 Account constituted or were derived from Client Company funds. Accordingly, all funds transferred from the 6077 Account to the 9207 Account: (1) constituted or were derived from Client Company funds, and/or (2) constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957. Further, the 9207 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957 as a result of these transfers.

147. Between June 20, 2003 and May 4, 2004, Le also deposited approximately $2,152 in checks drawn on Star Labor's Citizens Bank account number 1137601806 (the "1806 Account").  I also have reviewed bank records relating to the 1806 Account through June 18, 2004, and all of the $73,261 deposited into the 1806 Account between March 1, 2004 and May 4, 2004 was comprised of cash and/or Client Company checks.  For the reasons set forth in Paragraph 108 above, I have probable cause to believe that the cash deposits into the 1806 Account constituted or were derived from Client Company funds.  Accordingly, I have probable cause to believe that all funds deposited into the 1806 Account on or before May 4, 2004 constituted or were derived from Client Company funds, and property involved in violations of 18 U.S.C. §§ 1956 and/or 1957.  Accordingly, all funds transferred from the 1806 Account to the 9207 Account: (1) constituted or were derived from Client Company funds, and (2) constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property.  Further, the 9207 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957 as a result of these transfers.

148. On September 25, 2003, Le deposited check number 3368, drawn on the 8421 Account in the amount of $15,000, into the 9207 Account.  The two deposits into Le's 8421 Account prior to September 26, 2003 – the date on which check number 3368 cleared

78

the 8421 Account - were both cash deposits.  On September 17, 2003, Le deposited approximately $9,500 in cash into the 8421 Account, and on September 25, Le deposited approximately $9,800 into the 8421 Account.  For the reasons set forth in Paragraph 108 above, I have probable cause to believe that these cash deposits into the 8421 Account constituted or were derived from Client Company funds.  Based on my review of Le's bank records, the consensually recorded conversations between Le and CW described in Paragraph 78 above, and my training and experience, I also believe that Le structured these cash deposits into the 8421 Account to avoid the reporting requirements of 31 U.S.C. § 5313(a).  Accordingly, I have probable cause to believe that the $15,000 transferred from the 8421 Account to the 9207 Account: (1) constituted or was derived from Client Company funds, (2) was traceable to property involved in structured transactions, and (3) constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957.  I further have probable cause to believe that the 9207 Account constituted property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property, as a result of there transfers.

149.  On April 23, 2004, Tina Le deposited check number 2154, in the amount of $600, into the 9207 Account.  This check was drawn on an account held in the name of Tiep Van Le d/b/a Le's Sportswears.  Based on my review of Client Company checks cashed

79

at Broadway and insurance audit records, I recognize Le's
Sportswears as a Client Company of the Tina Le Organization.
Accordingly, I have probable cause to believe that check number
2154 constituted or was derived from Client Company funds.
Further, I have probable cause to believe that the 9207 Account
constituted property involved in violations of 18 U.S.C. §§ 1956
and/or 1957 as a result of this deposit.

150. Based on the foregoing, I have probable cause to
believe that at least $200,928 of the $420,219 deposited into the
9207 Account between June 20, 2003 and May 4, 2004 constituted or
was derived from Client Company funds, and/or constituted
property involved in violations of 18 U.S.C. §§ 1956 and/or 1957.
I further have probable cause to believe that $53,900 deposited
into the 9207 Account during that time period constituted
property involved in structuring violations, and that the 9207
Account constituted property involved in violations of 18 U.S.C.
§§ 1956 and/or 1957 at the time the 204 North Montello Deposit
Checks cleared.  Accordingly, I have probable cause to believe
that: (1) the 204 North Montello Deposit Checks constituted or
were derived from proceeds traceable to violations of 18 U.S.C.
§§ 1341 and/or 1343, (2) the 204 North Montello Deposit Checks
constituted property traceable to property involved in violations
of 31 U.S.C. § 5324(c), and (3) the 204 North Montello Deposit

Checks constituted property involved in violations of 18 U.S.C.
§§ 1956 and/or 1957, or property traceable thereto.

**B.    The Down Payment For 204 North Montello**

151. According to the page of the Purchase and Sale
Agreement for 204 North Montello retrieved from the 301 Adams
trash, the sale closing was scheduled to take place on October
26, 2004, at Le's attorney's office.  Bank records and documents
retrieved from the 301 Adams trash revealed that Le was
represented in the purchase of 204 North Montello by Greenbaum,
Nagel, Fisher & Hamelburg, which has offices at 200 High Street,
Boston, Massachusetts.  On October 26, 2004, I was conducting
surveillance at 301 Adams Street.  At approximately 11 a.m., I
saw Tina Le, Steven Nguyen and Misa Tang get into a 2003 black
Jaguar registered to Tina Le.  I followed the Jaguar to the area
of 200 High Street, Boston, Massachusetts.  My observations
confirmed that the closing date on 204 North Montello was October
26, 2004.

152. Asian American Bank records revealed that Tina Le
purchased Asian American Bank Official Check number 21493 in the
amount of $431,536.86, made payable to Greenbaum, Nagel, Fisher &
Hamelburg on October 26, 2004 (the "204 North Montello Down
Payment Check").  Those records further revealed that Le
purchased the 204 North Montello Down Payment Check with check
number 168 drawn on her Asian American Bank account number

81

310029269 (the "9269 Account").  For the reasons set forth below,
I have probable cause to believe that certain funds on deposit in
the 9269 Account on October 26, 2004 constituted or were derived
from Client Company funds, that certain funds on deposit in the
9269 Account on October 26, 2004 were traceable to property
involved in structured transactions, and that the 9269 Account
was involved in violations of 18 U.S.C. §§ 1956 and/or 1957.  A
chart depicting the following transactions is attached as Exhibit
8.

153.  I have reviewed records relating to the 9269 Account
through November 29, 2004, 2004.  Le opened the 9269 Account on
August 1, 2004.  Between August 1, 2004 and October 26, 2004, Le
deposited approximately $536,171 into the 9269 Account.

154.  Le deposited approximately $49,876 in cash into the
9269 Account before October 26, 2004.  Le made at least one of
those cash deposits – $7,505 on October 19, 2004 – on the same
day surveillance units observed her at Broadway.  For the reasons
set forth in Paragraph 108 above, I have probable cause to
believe that these cash deposits constituted or were derived from
Client Company funds.

155.  On September 7, 2004, Le deposited two Star Labor
paychecks, payable to Tina Le, into the 9269 Account.  The August
23, 2004 check, in the amount of $714.03, and the August 30, 2004
check, in the amount of $713.45, were both drawn on Star Labor's

1806 Account.  I reviewed records relating to the 1806 Account

through June 18, 2004, and all but $217 of the deposits into the

1806 Account during that time period were comprised of Client

Company checks and cash.  As set forth in Paragraph 147 above, I

have probable cause to believe that the cash deposits into the

1806 Account constituted or were derived from Client Company

funds.  I therefore have probable cause to believe that the 1806

Account constitutes property involved in violations of 18 U.S.C.

§§ 1956 and/or 1957.  Further, although I have not reviewed

records relating to the 1806 Account between June 18, 2004 and

September 7, 2004, based on my review of records relating to all

of Star Labor's bank accounts, as well as all other accounts

maintained by the Tina Le Organization, I have probable cause to

believe that most, if not all, of the deposits between June 18,

2004 and September 7, 2004 constituted or were derived from

Client Company funds.  Accordingly, I have probable cause to

believe that these deposits from the 1806 Account into the 9269

Account: (1) constituted or were derived from Client Company

funds, and/or (2) constituted property involved in violations of

18 U.S.C. § 1956.  Further, I have probable cause to believe that

the 9269 Account constituted property involved in violations of

18 U.S.C. § 1956 as a result of these deposits.

156. On August 17, 2004, Le deposited Citizens Bank Official

Check number 078113851-6, in the amount of $415,057.91 and dated

83

August 11, 2004 (the "Citizens Check"), into the 9269 Account.
The Citizens Check represented the closing withdrawal from Le's
9207 Account.  For the reasons set forth below, I have probable
cause to believe that $671,260 of the $920,068 deposited into the
9207 Account constituted or were derived from Client Company
funds and/or property involved in violations of 18 U.S.C. §§ 1956
and/or 1957, $53,900 deposited into the 9207 Account is traceable
to structured transactions, and that the 9207 Account constituted
property involved in violations of 18 U.S.C. §§ 1956 and/or 1957:

> a.    As set forth above, at least $200,928 of the
>       $420,219 deposited into the 9207 Account
>       between June 20, 2003 and May 4, 2004
>       constituted or was derived from Client
>       Company funds and/or constituted property
>       involved in violations of 18 U.S.C. §§ 1956
>       and/or 1957, and $53,900 deposited into the
>       9207 Account during that time period
>       constituted property involved in structuring
>       violations.
>
> b.    Between May 4, 2004 and August 11, 2004, Le
>       deposited approximately $499,849 into the
>       9207 Account.
>
> c.    Approximately $16,000 of the deposits between
>       May 4, 2004 and August 11, 2004 consisted of

84

cash, which, for the reasons set forth in
Paragraph 108, I have probable cause to
believe constituted or was derived from
Client Company funds.

d. Approximately $1,435 of those deposits
consisted of checks drawn on the 1806
Account, which as set forth in Paragraph 148
above I have probable cause to believe is
comprised almost entirely of Client Company
funds, and constitutes property involved in
violations of 18 U.S.C. §§ 1956 and/or 1957.

e. On May 28, 2004, Le deposited a check for
$452,897.42 into the 9207 Account. The payor
of the check was Watkinson Title & Closing,
and the memo read "Net to Borrower."
Mortgage company records and information on
file with the Norfolk County Registry of
Deeds indicate that Le refinanced the
mortgage on 301 Adams in May 2004, using the
equity she had acquired in 301 Adams through
funds constituting or derived from proceeds
traceable to violations of 18 U.S.C. §§ 1341
and/or 1343, and through property involved in
violations of 18 U.S.C. §§ 1956 and/or 1957

85

(see Paragraphs 109 through 123 above), to
obtain a $641,900 mortgage on 301 Adams, with
$452,897.42 net to Le at closing.
Accordingly, I have probable cause to believe
that the $452,897.42 check deposited into the
9207 Account on May 28, 2004 constituted or
was derived from proceeds traceable to
violations of 18 U.S.C. §§ 1341 and/or 1343,
and/or that it constituted property involved
in violations of 18 U.S.C. §§ 1956 and/or
1957, or property traceable to such property.

157. Based on the foregoing, I have probable cause to
believe that at least $466,361 of the $536,171 deposited into the
9269 Account between August 1, 2004 and October 26, 2004
constituted or was derived from Client Company funds, and/or
constituted property involved in violations of 18 U.S.C. §§ 1956
and/or 1957.  I further have probable cause to believe that the
9269 Account constituted property involved in violations of 18
U.S.C. §§ 1956 and/or 1957 at the time the 204 North Montello
Down Payment Check cleared.  Accordingly, I have probable cause
to believe that: (1) the 204 North Montello Down Payment Check
constituted or was derived from proceeds traceable to violations
of 18 U.S.C. §§ 1341 and/or 1343, and/or (2) the 204 North
Montello Down Payment Check constituted property involved in

86

violations of 18 U.S.C. §§ 1956 and/or 1957, or property
traceable to such property.

    **C.**   **Forfeitability Of 204 North Montello**

    158. Based on the foregoing, I have probable cause to
believe that 204 North Montello is forfeitable to the United
States pursuant to 18 U.S.C. § 981(a)(1)(C) as property
constituting or derived from proceeds traceable to violations of
18 U.S.C. §§ 1341 and/or 1343.  I further have probable cause to
believe that 204 North Montello is forfeitable to the United
States pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved
in violations of 18 U.S.C. §§ 1956 and/or 1957, or property
traceable to such property.

**CONCLUSION**

    159. Based on the foregoing, I submit that there is probable
cause to believe that the Defendant Properties constitute or are
derived from proceeds traceable to violations of 18 U.S.C. §§
1341 and/or 1343, and therefore are subject to forfeiture to the
United States pursuant to 18 U.S.C. § 981(a)(1)(C).  I further
submit that there is probable cause to believe that the Defendant
Properties constitute property involved in violations of 18
U.S.C. §§ 1956 and/or 1957, or property traceable thereto, and
therefore are subject to forfeiture to the United States pursuant
to 18 U.S.C. § 981(a)(1)(A).

87

Signed under the pains and penalties of perjury this 9th day
of December 2004.

Brad Carpenter
Special Agent
Federal Bureau of Investigation

**TINA LE ORGANIZATION**
**SEPTEMBER 1995 – PRESENT**

**Wonder Fast Labor Services**
Incorporation: 9/18/95

**First State Labor Services**
Incorporation: 12/13/95

*June 1999*

**Bay State Temp. Agency**
Incorporation: 6/8/99

*June 1998*

**T. Nguyen Temporary**
Incorporation: Not Incorporated

*January 1999*

**Mass Labor Service**
Incorporation: 9/9/98

*September 1999*

*January 2001*

**Labor Staffing**
Incorporation: 1/25/01

*May 2003*

**Star Labor Staffing**
Incorporation: 1/22/02



PENGAD-Bayonne, N. J.

**GOVERNMENT EXHIBIT**
1

**EXHIBIT 2**

| COMPANY | AUDIT PERIOD | CLIENTS REPORTED | ACTUAL CLIENTS | EXPOSURE REPORTED | ESTIMATED ACTUAL EXPOSURE |
|---|---|---|---|---|---|
| First State Labor | 12/27/95 – 12/27/96 | 3 | *at least* 7 | $49,145 | *at least* $226,119 |
| First State Labor | 12/27/96 – 12/27/97 | 3 | *at least* 17 | $73,348 | *at least* $1,700,000[1] |
| First State Labor | 12/27/97 – 6/11/98 | ?[2] | *at least* 15 | $26,275 | *at least* $641,514[3] |
| T. Nguyen Temporary | 2/18/98 – 7/14/98 | 0 | *at least* 10 | $0 | *at least* $555,846[4] |
| Bay State Temp Agency | 5/22/99 – 5/22/00[5] | 3 | *at least* 13 | $99,473 | at least $4,945,176 |
| Wonder Fast Labor Serv. | 10/4/95 – 10/4/96 | 3 | *at least* 4 | $58,869 | *at least* $305,749 |
| Wonder Fast Labor Serv. | 10/4/96 – 10/4/97 | 2 | *at least* 4 | $126,169 | *at least* $731,400 |
| Wonder Fast | 10/4/97 – 3/4/98[6] | 2 | *approx.* 5[7] | $43,762 | *approx.* $633,437[8] |
| Mass Labor Services | 11/20/98 – 11/20/99 | 6 | *at least* 48 | $125,138 | *at least* $3,738,141 |
| Mass Labor Services | 11/20/99 – 3/1/00 | 3 | *approx.*[9] 25 | $45,853 | *at least* $1,481,253[10] |
| Mass Labor Services | 2/28/00 – 2/28/01 | 4 | *at least* 20 | $154,539 | *at least* $563,208[11] |
| Labor Staffing | 12/02/00 – 12/02/01 | 3 | *at least* 11 | $118,826 | *at least* $370,351[12] |
| Labor Staffing | 12/02/01 – 12/02/02 | 4 | [bank records for this period yet to be produced] | $187,172 | [bank records for this period yet to be produced] |
| Labor Staffing | 12/10/02 – 12/10/03 | 0 | *at least* 19 | $0.00[13] | *at least* $1,675,468[14] |
| Star Labor Staffing | 02/02/03 – 02/02/04[15] | 5 | *at least* 16 | $183,173 | *at least* $2,481,906 |

PENGAD-Bayonne, N. J.

**GOVERNMENT EXHIBIT**

2

1.  According to John Foster, the Travelers auditor who conducted the First State audit for this policy period, First State initially reported $73,348 in exposure.  Foster asked for more documents, and Pham-Do Accounting provided the First State 1996 corporate tax return, Form 1120, reflecting over $1.5 million in outside labor.  When he reviewed the bank statements, he noticed a pattern of significant amount of cash withdrawals by Le, checks written to "cash" or to Le, and endorsed by Le.  The checks usually were written and cashed on a Thursday or Friday, so Foster assumed they were for payroll.  Accordingly, Foster classified all of the cash withdrawals by Le as warehouse and wholesale employee checks and included them in the exposure figure, which he calculated to be $1.7 million based on the documents he reviewed.

2. According to the insurance auditor, the insured did not provide this figure.

3. Foster also conducted the audit for this policy period.  Once again, First State reported a low exposure figure, but his review of First State records revealed more suspicious payments  to "T & L Temps", "Than Nguyen" and "T. Nguyen Temps", as well as cashed checks by Tina Le.  Accordingly, Foster calculated the actual exposure based on his review of First State records as $641,514.

4. Audit records revealed that T. Nguyen did not cooperate with this audit.  The actual exposure figure was calculated based on checks from First State to T. Nguyen during this time period.

5. Bay State was only operated by Steven Nguyen for the first four months of this policy period.

6. This was a cancellation audit for Wonder Fast.  Wonder Fast reapplied for workers' compensation insurance, but its policy was cancelled because it did not cooperate with an audit.

7. Wonder Fast had approximately 5 Client Companies during the calendar year 1998.

8. The estimated actual exposure for this five-month period was calculated by dividing the estimated actual exposure for the calendar year 1998 by .417.

9. Mass Labor had approximately 25 Client Companies during the calendar year 2000.

10. The estimated actual exposure for this three-month policy period was calculated by dividing the estimated actual exposure for the calendar year 2000 and dividing it by four.

11. This figure is based on checks cashed at Broadway for only a six month period during this audit year.

12. As previously stated, the subpoenas to Client Companies were served in June 2001. Accordingly, not only does this figure represent income from only seventy percent of the known Client Companies, it also represents less than twelve months of income.

13. Records from Labor Staffing's workers' compensation carrier, Travelers, reveal that no audit ever was done for this period. After several attempts to contact Labor Staffing, including in writing, Travelers received no response and learned that the phone had been disconnected. Travelers then turned to Labor Staffing's accountant, Pham-Do Accounting, who told Travelers that Labor Staffing had gone out of business.

14. This figure is based on Client Company checks cashed by Labor Staffing for only the first three-quarters of the audit period. After the end of this audit period, Labor Staffing received at least $37,219.94 in Client Checks, most of which were endorsed by Star Labor. In addition, this figure does not include Client Company checks that may have been deposited directly into bank accounts, because those records have not yet been produced.

15. Star Labor also obtained insurance coverage for the policy period February 2, 2002 through February 2, 2003. However, audit records and bank records reflect that the Tina Le Organization did not begin operating under the Star Labor name until approximately May 2003.

**301 ADAMS DEPOSIT CHECK**



PENGAD-Bayonne, N. J.

GOVERNMENT
EXHIBIT

3

**301 ADAMS DOWN PAYMENT CHECK**

$300

$7,000 from 2743 Acct. as of 11/30/98

2743 Acct. as of 11/30/98

6099 Acct. as of 11/30/98

Transfers from 2743 Acct. prior to 10/28/98

Client Company Checks

Cash

$40,000 Ck from 7886 Acct. on 10/5/98

$9,200 AAB ck to Mercedes Tang 10/12/98

Client Company Checks

$2,150 from 6099 Acct. 11/30/98

$100 Cash 10/28/98

7886 Account as of 11/18/98

2743 Acct. as of 12/3/98

7012 Acct. as of 12/2/98

$131,215 from 2743 Acct. on or before 12/3/98

$1,320 from 7012 Acct. 12/2/98

$12,403

$9,800 from 7886 Acct. on or before 11/18/98

$3,116 Ck. Client Co. Dem Nguyen 9/28/98

$2,800 Ck. Client Co. Mary Phuong Duong, 9/28/98

$1,520 Ck. Client Co. T&T Sewing 10/1/98

$162,173 deposited into 8421 Acct. as of 12/4/98

$116,742.76 Down Payment Ck. clears 8421 Acct. 12/4/98

PENGAD-Bayonne, N. J.

GOVERNMENT EXHIBIT

4

**1548 DORCHESTER DEPOSIT CHECKS**

Client Co. cks.

Cash

Client Co. cks.

2355 Acct. as of 1/28/00

8008 Acct. as of 2/2/00

$482 balance of 2922 Acct. as of 11/30/98

$10,000 Cash between 11/30/98 & 2/7/00

$29,640 from 8008 Acct. between 11/30/98 & 2/2/00

$150,942 between 11/30/98 & 2/7/00

$30,000 from 2355 Acct. between 11/30/98 & 1/28/00

$221,064 dep. into, or on dep. in 2922 Acct. as of 2/7/00

$24,000 Deposit Ck. Clears 2922 Acct. 2/7/00

$1,000 Deposit Ck. Clears 2922 Acct. 2/7/00

PENGAD-Bayonne, N. J.

GOVERNMENT EXHIBIT

5

# 1548 DORCHESTER DOWN PAYMENT CHECK



Client Co. cks. → 2355 Acct. as of 2/14/00

Cash → 2355 Acct. as of 2/14/00

Client Co. cks. → 8008 Acct. as of 2/8/00

$482 balance of 2922 Acct. as of 11/30/98

$10,000 Cash between 11/30/98 and 2/7/00

$29,640 from 8008 Acct. between 11/30/98 & 2/2/00

$9,750.29 ck. purchased with funds from 8008 Acct. 2/8/00

$37,300 from 2355 Acct. between 11/30/98 & 2/14/00

$218,995 between 11/30/98 & 2/25/00

$306,167 dep. into, or on dep. in 2922 Acct. as of 2/25/00

$217,843.69 Down Payment Ck. clears 2922 Acct. 2/25/00

PENGAD-Bayonne, N. J.

GOVERNMENT EXHIBIT

6



204 NORTH MONTELLO DEPOSIT CHECKS

PENGAD-Bayonne, N. J.

GOVERNMENT
EXHIBIT

7

**204 NORTH MONTELLO DOWN PAYMENT CHECK**

Client Co. cks.

Cash

$6,700

$9,500 Cash deposit 9/17/03

$9,800 Cash deposit 9/25/03

$217

Client Co. cks.

Cash

6077 Account

8421 Acct. as of 9/26/03

1806 Account as of 6/8/04

$189,628 Cash, including $53,900 structured

$9,548 transferred from 6077 Acct.

$600 ck. Client Co. Le's Sportswears 4/23/04

$15,000 from 8421 Acct. 9/26/03

$452,897.42 proceeds of 301 Adams refinance 5/28/04

$3,587 cks. drawn on 1806 Acct.

$248,808

$920,068 into 9207 Acct. as of 8/11/04 (date of closing)

$415,057.91 from 9207 Acct. 8/16/04

$49,876 Cash

$69,810 deposited as of 11/26/04

$1,427 from 1806 Acct. 9/7/04

$536,171 deposited into 9269 Acct. as of 10/26/04

$431,536.86 Down Payment Ck. clears 9269 Acct. 10/26/04

PENGAD-Bayonne, N. J.

GOVERNMENT EXHIBIT

8

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America v.

## DEFENDANTS

301 Adams Street, Quincy, Massachusetts, et al.,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Kristina E. Barclay, Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA  02210   (617) 748-3100

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

XX 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                    AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

XX 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | XX 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Tort Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

United States seeks the forfeiture of the defendant real property pursuant to Title 18,
United States Code, Section 981(a)(1)(C), and Title 18, United States Code, Section 981(a)(1)(A)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE _____

DOCKET NUMBER _____

DATE
12/9/04

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)  United States of America v. 301 Adams Street,
   Quincy, Massachusetts, et al.,

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
   rule 40.1(a)(1)).

   ___  I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ___  II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,        *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

   ___  III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

   XX   IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

   ___  V.     150, 152, 153.

   *04 - 12582 RCL*

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this
   district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                    YES ☐        NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28
   USC §2403)

                                                    YES ☐        NO ☒

   If so, is the u.s.a. or an officer, agent or employee of the u.s. a party?

                                                    YES ☐        NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 usc §2284?

                                                    YES ☐        NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the commonwealth of
   massachusetts ("governmental agencies"), residing in massachusetts reside in the same division? - (See local rule 40.1(d)).

   N/A                                              YES ☐        NO ☐

       A.     If yes, in which division do all of the non-governmental parties reside?

              Eastern Division ☐        Central Division ☐        Western Division ☐

       B.     If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
              agencies, residing in Massachusetts reside?

              Eastern Division ☐        Central Division ☐        Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
   submit a separate sheet identifying the motions)

   N/A                                              YES ☐        NO ☐

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME**  Kristina E. Barclay, Assistant United States Attorney

**ADDRESS**  United States Attorney's Office, 1 Courthouse Way, Suite 9200, Boston, MA  02210

**TELEPHONE NO.**  (617) 748-3100

**(Cover sheet local.wpd - 09/12/02)**